PERINI CORPORATION *vs.* MASSACHUSETTS PORT AUTHORITY.

Suffolk.    April 19, 1973. — March 14, 1974.

Present: GOODMAN, KEVILLE, & ARMSTRONG, JJ.

*Contract,* Construction, Building contract.

Certain provisions of a construction contract involving preexcavation of locations where piles were to be driven gave the project engineer the power to interpret conclusively an ambiguous provision of the contract as to the depth of the preexcavation, and a letter from the engineer to the contractor to the effect that the contractor should not preexcavate beyond sixty feet and would not be paid for doing so constituted an interpretation of the ambiguous provision and precluded recovery by the contractor for preexcavating beyond sixty feet after receipt of the letter [36-45]; but where the contractor had notified the engineer about a month before such letter to the effect that preexcavation beyond sixty feet was about to begin and thereafter notified the engineer that it was continuing, and the engineer did nothing to prevent it until such letter, the engineer must be taken to have acquiesced in it until such letter was sent, and the contractor was entitled to recovery for the preexcavation beyond sixty feet done prior to receipt of the letter [45-46].

CONTRACT.    Writ in the Superior Court dated November 28, 1967.

The action was heard by *Ponte,* J., on an auditor's report.

*William L. Patton (John M. Harrington, Jr.,* with him) for the defendant.

*Herman Snyder (Steven J. Comen* with him) for the plaintiff.

ARMSTRONG, J.    This is an action brought by Perini Corporation (Perini) to recover damages under a contract to construct the foundation of the Southwest Air Terminal at Logan International Airport.    The declaration contains four counts.    Counts one and two are a claim for payment at a unit price fixed by the contract for certain "preexcavation" or predrilling of locations where piles were to be driven, which predrilling Perini

contends is required by the contract, but the defendant Massachusetts Port Authority (Authority) contends is in excess of contract requirements. Counts three and four are an extra work claim by Perini, which maintains that its subcontractor was required by the Authority's engineer to drive certain piles in excess of contract requirements.

The case was referred to an auditor whose findings of fact were to be final, and who found for Perini on the predrilling claim, and for the Authority on the over-driving claim. The objections of both parties to the auditor's report were overruled, and the report was confirmed, all subject to exceptions duly saved; and judgment was ordered to enter for Perini on counts one and two in the amount of $35,994.00, plus $8,458.59 interest, and for the Authority on counts three and four. The case is here on the Authority's appeal and bill of exceptions which raise the propriety of the judge's overruling of the objections to the report, his denial of motions relative to the report, and his order that judgment enter for Perini on counts one and two.

From the auditor's uncontested findings it appears that Perini and the Authority executed a written contract on June 13, 1966, and that Perini subcontracted with Carter Pile Driving, Inc. (Carter), a firm specializing exclusively in driving piles, to do that part of the work. The specifications called for the placement of 1,009 precast, "prestressed" concrete piles, of an average weight of 20,000 pounds each, driven to rock or hardpan, the "bearing stratum on which the pile rests." Section 4-10 of the specifications, entitled "PreExcavation," provided:

> "Immediately before each pile is driven, a hole shall be pre-drilled at the pile location to a minimum of 60 ft. depth below the cut off elevation of the piles or within 5 feet of the top of the rock or hardpan. The hole shall be 18 inches in diameter. Drilling shall be by the wet rotary method; augering will not be permitted.

"It is of utmost importance that the hole be com-
pletely drilled and be kept full of heavy slurry until
the pile is placed therein in order to insure holding
the sides of the hole in place.    The pile shall be
lowered into the hole under its own weight."

Other sections of the specifications required that when
each pile stopped descending under its own weight,
driving was to begin and to continue without interruption
until a certain resistance was met, indicating that the pile
had reached the supporting rock or hardpan.    Most piles
were to be driven in clusters.    Each cluster was to be
covered with a single, specially designed pile cap.

Perini's accepted bid proposal was based on an estimate
of 61,000 feet of predrilling, or approximately 60 feet per
pile.    Predrilling was, however, made a unit-price item,
to be paid for at the rate of $2.10 per foot "to required
depths".    The auditor found that on June 23, 1966, there
was a preconstruction meeting, attended by representa-
tives of Perini, Carter, the Authority, Eastern Airlines
(which was to occupy the terminal building when
completed), Desmond & Lord, the architect and engineer
for the project (Desmond), and Sepp Firnkas Engineer-
ing, Inc., the structural engineer engaged by Desmond
(Firnkas).    At that meeting it appears to have been
agreed or understood that predrilling would be to a
depth of 60 feet below the specified cut-off elevation of
the piles, unless construction difficulties made further
predrilling advisable.

Carter began driving piles in August.    No problems
arose in locations where piles were to be driven singly or
in small clusters; but on and after August 30, when
Carter commenced driving piles for the main building,
where piles were to be clustered in groups of nine to
twenty-nine piles, it encountered problems of pile toler-
ance and excessive deviation in placement.    On Septem-
ber 2, at a job site conference, Firnkas' inspector ex-

pressed concern lest the deviations in certain clusters be so great as to require redesign of pile caps. Carter's representatives suggested that the problems could be eliminated if they were to predrill to a greater depth, and they made a proposal to predrill a pile to a greater depth as a test. The problem was also discussed in letters from Firnkas to Desmond and from Desmond to Perini; and at a job site meeting on September 9 Firnkas' inspector authorized Carter to predrill one pile to a depth of 80 feet to test the effect on deviation and tolerance. Later the same day, at the location of the 75th pile, Carter predrilled to 80 feet, and encountered no tolerance problem.

On September 16 Perini's superintendent wrote to Desmond that he had directed Carter to start predrilling to within five feet of rock or hardpan, and to test this procedure immediately on all the piles in one cluster of eighteen or more. The letter stated, "If you feel that a meeting is necessary before we start the deeper predrilling, or if you are in disagreement with this procedure, please notify us immediately." On September 22 Carter began predrilling to 80 feet, starting with pile number 137.

On September 29 Perini received a copy of a letter written September 23 from Firnkas' project engineer to Desmond, expressing the view that predrilling beyond 60 feet was unnecessary and might well create a problem of uplift "by reducing the soil friction tending to hold the pile down." He instead recommended certain corrective techniques which the auditor found Carter was already applying.

On September 30 Desmond sent Perini a letter requesting a proposal from Perini to increase the rate of placement of piles so as to meet the contract schedule. At a meeting on October 7, attended by representatives of Firnkas, the Authority, Perini and Carter, numerous measures to accelerate progress were discussed, and mention was made that the deeper predrilling recently

begun had contributed and would continue to contribute to the acceleration desired.

On October 10 Carter by letter gave Perini a report on its progress in implementing several measures agreed upon, and in the letter stated:

> "As you know, the increased depth of drilling which we started on September 22 has cut our redrives from a high of 80 % to an average of 25 %; naturally this is a definite time saver and therefore will increase our production, so we hereby notify you that we will continue to drill up to a maximum depth of within 5′ of rock or till."

On October 13 Perini sent a copy of Carter's October 10 letter to Desmond and stated:

> "Your comments on . . . [Carter's] observations regarding drilling to depths of eighty (80) feet will be appreciated."

On October 18 Firnkas sent a letter to Desmond stating:

> "We are in receipt of a letter from Carter Pile Driving, Inc., dated October 10, 1966, noting that predrilling operations were now being carried on beyond the required 60 feet. Carter is welcome to do so, but it should be clear that the distance beyond 60 feet will be at his own expense. As noted in our earlier letter of September 23, 1966 we did not agree to extending the depth of drilling.
>
> "Predrilling to beyond 60 feet does not benefit the owner in any way. If it is a benefit to the Contractor, the owner should not be required to pay for the additional predrilling."

Desmond forwarded a copy of Firnkas' letter to Perini on the same day, October 18.

On October 21 Desmond wrote a letter to Perini, stating therein:

> "All preexcavation beyond the sixty (60') feet required by our engineers has been and will continue to be at the Contractor's own expense. Item #2 of the Proposal clearly states that payment shall be made only for linear feet of preexcavation to required depths.
>
> "Your attention is directed to the Specifications, Division I, Article 20, Paragraph 3; Article 21, and Article 22, Paragraph 11."

Perini replied by letter on October 25. Its letter, according to the auditor, observed "that the fact that the engineer had not directed discontinuance of preexcavation beyond 60 feet showed recognition of specification requirements and desirability or predrilling beyond 60 feet." The letter ended:

> "Therefore, we must conclude that an attempt is being made to evade payment for work contemplated by the Contract and required to be performed to properly drive the piles. We cannot believe that the intention was to preexcavate to a depth of 60 feet regardless of pile lengths. If that were true, there would have been no necessity of establishing a lower limit and including a unit price rather than a lump sum for the drilling."

On October 28 Desmond sent a letter to Perini specifically instructing Perini to cease predrilling beyond 60 feet, and calling for a meeting on October 31 which we infer (1) was to be attended by all parties concerned and

(2) actually took place, but about which we know nothing further. We do know that Carter continued to predrill beyond 60 feet; that after October 31 Firnkas' on-site inspectors, who kept a record of each pile driven, recorded 60 feet of predrilling regardless of the actual amount of predrilling done; and that the auditor made a finding, objected to by the Authority, that piles thereafter were predrilled to an average depth of 80 feet. On November 4 Perini wrote a letter to Desmond which took the position that

". . . the contractor has the option to the depth of the preexcavation between the minimum limit of 60 feet and the maximum limit of within 5 feet of hardpan or rock . . .. We feel further that the actual footage of preexcavation performed should be paid for under the appropriate unit price item in the contract. Because payment for this item has been questioned, we shall not include it in our monthly requisitions, but this should not be construed as an indication that we shall not requisition for payment at a later date when the final contract quantities are being determined."

The controversy set forth above arises out of the hopeless ambiguity of the phrase used in section 4-10 of the specifications — "to a minimum of 60 ft. depth below the cut off elevation of the piles or within 5 feet of the top of the rock or hardpan." The Authority argues that it should be read as if it concluded, "whichever is less"; and that it means that the contractor should predrill to 60 feet unless "five feet of the top of the rock or hardpan" is encountered earlier. Perini argues that the Authority's interpretation disregards the word "minimum" and that the phrase should be read as if it concluded, "whichever is greater." The Authority argues that under Perini's interpretation the only possible application of the

reference to 60 feet would be to require the contractor in some cases to predrill an arbitrary distance *into* rock or hardpan (defined by the auditor as "the bearing stratum *on* which the pile rests" [emphasis added]). A third interpretation, suggested in Perini's letter of November 4, 1966, would read the phrase as establishing a range for predrilling with 60 feet as the minimum, and five feet above rock or hardpan as the maximum. Assuming, as this interpretation appears to assume, that rock or hardpan was expected always to be encountered at depths greater than 60 feet, [1] it does not necessarily follow that it was intended that the contractor would have discretion to predrill to whatever depth it chose within that range. The auditor's report contains no specific subsidiary finding as to the intentions of the parties in this respect when they executed the contract.

The judge appears to have adopted one or the other of Perini's two interpretations of the ambiguous phrase in section 4-10 of the specifications. In the view which we take of the case it is not necessary to determine what the phrase was intended to, or does in fact, mean. Rather, we are of the opinion that the case is governed by certain other provisions of the written contract by the parties. [2]

---

[1] The auditor did not make a finding as to whether it was expected that rock or hardpan might be encountered in any pile sites at depths less than 60 feet. He does find that in preparing the specifications Firnkas had prepared a borings report based on twenty-eight borings; that "these borings show hardpan to have been encountered at various depths through the site"; and, in a finding objected to by the Authority, that "the average depth at which five feet above rock or hardpan should be reached" was 80 feet. We are not informed whether the 80 feet referred to in that finding is measured from the same starting point as the 60 feet. The latter is to be measured from "the cut off elevation of the piles," and it does not appear that all 1,009 piles were to have the same cut off elevations.

[2] The auditor's report quotes a few provisions of the contract, but does not expressly incorporate the entire contract by reference. The Authority made objection to the omission of certain provisions from the report. In his certificate the auditor stated "Regarding defendant's objection No. 50 and its reference to such Articles of the

Article 28 of the contract, entitled "Authority of the Engineer," states in part:

> "The Engineer shall decide all questions which may arise as to the quantity, quality, acceptability, fitness, and rate of progress of the several kinds of work to be performed and materials to be furnished under the Contract, and shall decide all questions which may arise as to the interpretation of any part of the Contract, especially the Plans and Specifications which are a part thereof, as to the fulfillment of this Contract on the part of the Contractor, and the determination of the Engineer shall be final and conclusive . . ."

Article 20 of the contract, entitled "Intent of Plans and Specifications", states in part:

> "All Work to be done and furnished under the Contract shall be done and furnished strictly pursuant to, and in conformity with the Plans and Specifications for the Work, which said Plans and Specifications shall form part of the Contract, and also in accordance with the directions of the Engineer as given from time to time during the progress of the Work pursuant to the terms of the Contract."

---

contract not set forth in my Report . . . all exhibits introduced before me have been filed with the Clerk, Superior Court for Civil Business." We treat this statement as implicitly incorporating the entire contract by reference, and accordingly we directed the clerk of this court to call up the exhibits in order that we might have the entire contract before us. Of course a decision by an auditor or master that certain provisions of a contract are not applicable to the case before him is a ruling of law which may be disregarded. *O'Brien* v. *Dwight,* 363 Mass. 256, 282 (1973).

Finally, Article 22, entitled "Alteration of Work," states in part:

> "The Authority reserves and shall have the right to make such changes from time to time in the Plans, the form, character and quantity of the Work as may be considered necessary or desirable . . ..
>
> "In the event that the quantity of any item of Work as to which a unit price (or prices) is applicable is increased or decreased by an alteration in the Work, the Contractor shall perform such item of Work as altered at the Contract unit price or prices.
>
> "Whenever . . . the Engineer shall direct, order or require work which the Contractor considers to be alterations and as to which he had a claim for additional compensation or otherwise, the Contractor shall . . . submit to the Engineer a daily summary and listings of the types described in Article 23 in connection with extra work claims."

Article 28 established a method by which questions of interpretation of ambiguities in the contract should be determined. In our opinion a direction by the engineer, Desmond, to the effect that the contractor should not predrill beyond 60 feet, or to the effect that it was not required to predrill beyond 60 feet and would not be paid for so doing, constituted an interpretation of section 4-10. Perini's letters of October 25, 1966, and November 4, 1966, show that it conceived the dispute to be one of contract interpretation. "The engineer's decision does not appear to have been arbitrary or made in bad faith." *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 196 (1945). Nor can it be argued that it was beyond the reasonable contemplation of the parties, in view of the fact that Perini's bid was in fact based on 60 feet of predrilling per pile. In addition Article 22 authorized the Authority to order quantities of work greater or less than

those called for in the specifications. It is manifest from the contract provisions set out, and many others not set out, that "by the express terms of the contract both parties committed to the . . . [engineer]" power "to maintain control over the work as it progresse[d] . . . and to secure flexibility in adapting means to ends" so long as its discretion was "exercised within the framework of the original contract and for the purpose of carrying out the work originally intended." *Benjamin Foster Co.* v. *Commonwealth, supra,* at 203 and 205. The engineer had ample power under several provisions of the contract to require that predrilling be carried out to 60 feet only. It was not necessary that the engineer cite the particular provisions of the contract which authorized its instruction, nor by citing certain provisions did it waive provisions not cited, absent circumstances, not present here, constituting estoppel. *New England Structures, Inc.* v. *Loranger,* 354 Mass. 62, 65-67 (1968). *C. C. Mengel & Bro. Co.* v. *Handy Chocolate Co.* 10 F. 2d 293, 296 (1st Cir. 1926), cert. den. 271 U. S. 668 (1926).

Perini should receive payment at the contract price for the additional predrilling done in placing the 75th pile on September 9. No contention is made that that predrilling was not authorized by Desmond.

Perini's letter to Desmond on September 16 fully and timely notified Desmond that Carter was to commence predrilling to within five feet of rock or hardpan on a large cluster. Later communications fully notified Desmond that the deeper predrilling was continuing. Under the circumstances of daily communication between Desmond and Perini on construction details, Desmond was under an obligation to speak out if it wished to restrict predrilling to 60 feet. As it had not done so by September 22, when Carter started the deeper predrilling, it must be taken to have acquiesced. There is nothing in the auditor's report to indicate that that acquiescence terminated before Desmond's letter to Perini

dated October 21. Desmond's forwarding of Firnkas' letter to Perini on October 18 did not constitute an instruction by Desmond, who, as the designated engineer, was authorized by the contract to give such an instruction. It was Desmond's letter dated October 21 which had the effect of terminating Perini's right to treat predrilling beyond 60 feet as a requirement of the contract, entitling it to be paid at the unit price therein specified. Desmond's October 28 letter, which directed Perini not to predrill beyond 60 feet (a position we infer was subsequently abandoned), is not pivotal: the contract authorized payment for predrilling "to required depths", a phrase which can only mean required by the engineer or by the contract itself. Desmond's October 21 letter foreclosed both possibilities. 'That 'letter took effect on receipt. See *Brauer* v. *Shaw,* 168 Mass. 198, 200 (1897); Williston, Contracts (3d ed.) § 56. Corbin, Contracts, § 39. 2A C. J. S. Agency, § 122.

It follows that Perini is entitled to recover damages under the contract for the predrilling beyond 60 feet for the pile (number 75) driven on September 9, and for the piles (commencing with number 137) driven from September 22 until Desmond's letter of October 21 was received. Further than this we cannot go on the record before us, for two reasons. The auditor's report does not indicate how many piles were driven between September 22 and the time Perini received Desmond's letter of October 21. Nor do we know how many feet in excess of 60 were predrilled for each pile, although this will be easily ascertained in the Superior Court because it was not until after October 31 that the on-site inspector stopped keeping accurate records of predrilling. The case must therefore be remanded to the Superior Court for the purpose of making, or recommitting to the auditor with instructions to make, those findings. See *Coletti* v. *Hart,* 338 Mass. 174, 177-178 (1958).

We have reached our conclusion on the basis of findings in the auditor's report not objected to by either

party, and inferences from those findings.  *U. S. Fidelity & Guar. Co.* v. *English Constr. Co.* 303 Mass. 105, 108-109 (1939).  With the exception of paragraphs 152, 154 and 155 of the auditor's report, which compute Perini's damages on an erroneous ruling of law and which may therefore be disregarded, there is nothing in the report which is inconsistent with or has any bearing upon our conclusion from the uncontested findings.  It is not necessary, therefore, to deal with the defendant's numerous exceptions to the judge's actions in overruling various objections to the report and in denying various motions with respect to the report.  As the appeal from the order for judgment raises every issue necessary to the determination of the case, it is similarly unnecessary to consider the exceptions relating to the order for judgment.  We therefore treat the defendant's exceptions as waived.

The order for judgment is reversed.  The case is remanded to the Superior Court for the purpose of determining (1) the time when Desmond's letter dated October 21, 1966, was received by the plaintiff or its agents and (2) the number of feet of predrilling in excess of those already paid for done by the plaintiff or its subcontractor with respect to pile number 75, driven on September 9, 1966, and with respect to the piles, commencing with number 137, driven from September 22, 1966, until the time so determined.  Thereafter judgment is to enter for the plaintiff on counts one and two in conformity with this opinion.

*So ordered.*