## J. A. Sullivan Corporation *vs.* Commonwealth.

Suffolk.  March 6, 1986. — June 25, 1986.

Present: Hennessey, C.J., Wilkins, Nolan, Lynch, & O'Connor, JJ.

*Contract,* Commonwealth, Public works, Building contract, Construction of contract, Performance and breach, Implied. *Governmental Immunity. Architect. Commonwealth,* Contracts.

A public works contractor whose claim against the Commonwealth arose in a contractual setting was entitled to seek recovery on the theory of quantum meruit. [792-794]

A provision in a public works contract limiting recovery against the Commonwealth to claims arising under certain enumerated articles of the contract had the effect of limiting recovery to those persons who had signed the contract, and did not bar recovery by the contractor on the theory of quantum meruit. [794-796]

At the trial of a public works contractor's claim for recovery against the Commonwealth on the theory of quantum meruit, the judge was warranted in finding that the contractor had acted in good faith and had substantially performed its obligations under the contract. [796-798]

In an action against the Commonwealth by a public works contractor who had entered into a contract for construction of a State college building, the judge acted appropriately in interpreting the contract as authorizing the method of ledge removal employed by the contractor and in allowing additional compensation therefor, notwithstanding the architect's disapproval of the contractor's claim, where, although the contract had empowered the architect to direct the work as it progressed, the parties had not agreed to accept his decision as final and conclusive as to disputes arising after the relevant work had been completed, and where the architect, whose representative had observed the ledge removal, had given no instructions as to how that work should be accomplished. [798-801]

Civil action commenced in the Superior Court on May 11, 1977.

The case was heard by *Paul G. Garrity, J.*

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Elaine K. M. Denniston,* Assistant Attorney General, for the Commonwealth.

*David J. Hatem* for the plaintiff.

NOLAN, J. This is the defendant's appeal from a judgment of the Superior Court in the amount of $154,463.53, plus interest and costs, in favor of the plaintiff, J. A. Sullivan Corporation (Sullivan), following a contract dispute between Sullivan and the defendant, the Commonwealth. We transferred the case here on our own motion and address the following issues: (1) whether, as a matter of law, Sullivan is precluded from recovering against the Commonwealth on quantum meruit; (2) whether, given the terms of the contract, the judge erred in awarding recovery to Sullivan in quantum meruit; (3) whether the judge erred in awarding damages to Sullivan where Sullivan failed to complete construction under the contract; (4) whether the judge erred in ruling that Sullivan was entitled to additional costs for ledge removal. After reviewing the trial judge's findings and rulings under Mass. R. Civ. P. 52 (*a*), 365 Mass. 816 (1974), we affirm. We summarize the relevant facts drawn from the judge's findings and other portions of the record.

In August, 1973, Sullivan and the Commonwealth, through the Bureau of Building Construction (bureau), entered into a contract for the construction of a building at Salem State College to house the physical education facilities. The original contract price was $5,598,000. The price was later increased to $5,703,457.87. Work commenced in September, 1973, and was scheduled to be completed in August, 1975. The Commonwealth retained the services of an architect, Edward J. Tedesco Associates, Inc., who along with the bureau agreed to extend the completion date on several occasions. On March 17, 1976, Sullivan informed a project architect from Tedesco that the project would be substantially completed by March 31, and requested that a "punch list" be compiled for the remainder of the work. A punch list is an itemized list of finish work, corrections, repairs, and services to be performed in order to complete a construction contract.

On April 6, 1976, Sullivan notified a dean of Salem State College that it was awaiting a punch list, and that it expected to have the project completed by the end of April. On April 28, the project architect from Tedesco notified Sullivan that he was dissatisfied with the paucity of persons at the job site. Between April 6 and June 18, 1976, Tedesco compiled several punch lists covering different zones of the construction project, dated at different times. Some of the lists contained items from previous lists. The last punch list, dated June 18, 1976, was comprehensive, covering the entire project and containing some items that were not included on prior punch lists. John A. Sullivan, president of J. A. Sullivan Corporation, testified that it is a general practice in the construction industry to issue "monetized" punch lists (items are given a money value) to enable contractors to negotiate with subcontractors. The judge found that none of the punch lists which were sent to Sullivan from April to June, 1976, were monetized.

Sullivan continued working on items on the punch lists until the fall of 1976. On September 30, the architect compiled another punch list for the exterior and the roof of the project. In October, he sent another one for the entire project. This list was monetized by category only at a total value of $182,950.00.

On October 15, 1976, the bureau issued a Certificate of Use Occupancy, which provided that the contractor was relieved of responsibility for completion of work on the project except for the remaining items on the punch list. Fourteen days later the bureau complained to Sullivan about the insufficient number of workers at the site and stated that the bonding company would be notified if substantial progress towards completion was not accomplished within thirty days.

In November, Sullivan disputed the accuracy of the punch list which had accompanied the certificate of use occupancy and requested, among other things, a monetized punch list. Also at this time Sullivan submitted Requisition No. 34 for $318,976.15, for work performed between September 25, 1975, and October 31, 1976. No payment was made. In fact, the Commonwealth stated that it was withholding $29,300 in liquidated damages due to the plaintiff's failure to complete

construction on time, $154,757.11 for direct payment requests made by subcontractors, and $130,000 representing work remaining to be done.

In December, 1976, another updated punch list was compiled by Tedesco and sent to the Commonwealth and Sullivan. Correspondence between the Commonwealth and Sullivan reflected the Commonwealth's dissatisfaction with Sullivan's performance, and Sullivan's dispute with many items on the December punch list. Sullivan contended that many of the items had already been completed, and offered credit for those which could not be done.

On March 2, 1977, Sullivan received another updated, monetized punch list. This was the first list monetized on an item-by-item basis. Nine days later the Commonwealth informed Sullivan that its contract had been terminated. John A. Sullivan testified that at that time the total value of the punch list was $32,000.

The Commonwealth instructed Tedesco to draw up plans and specifications for a new contract and to include the uncompleted punch list items. The contract was submitted for bidding and was taken by T. G. Driscoll Construction Company.

On appeal, our review of the findings, rulings, and judgment of the trial judge, entered in this nonjury case on November 14, 1984, is governed by Mass. R. Civ. P. 52 (*a*), 365 Mass. 816 (1974), which provides that "[f]indings of fact shall not be set aside unless clearly erroneous." "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). This court must also examine the findings and rulings to make sure that the conclusions are not inconsistent with legal standards. *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976).

1. *Claim for quantum meruit against the Commonwealth.* We find no error in the judge's ruling that a quantum meruit claim can lie against the Commonwealth in this case. See *Albre Marble & Tile Co., Inc.* v. *Goverman*, 353 Mass. 546 (1968). See also *Arthur A. Johnson Corp.* v. *Commonwealth*, 318

Mass. 88, 89 (1945). The Commonwealth relies primarily on *Lewis* v. *Commonwealth,* 332 Mass. 4, 6 (1954), where this court said that "[t]here is no implied obligation upon the part of the Commonwealth to pay for the petitioner's services merely because they might have been beneficial . . . ." The Commonwealth misses the point in *Lewis, supra,* which was that extra services rendered *outside* the contract were not compensable. There was no such claim here.

The Commonwealth's argument is founded on the doctrine of sovereign immunity. The origin of sovereign immunity lies in an English principle in early common law that "the King can do no wrong." Governmental Tort Immunity in Massachusetts: The Present Need for Change and Prospects for the Future, 10 Suffolk U. L. Rev. 521, 527 & n.28 (1976), citing 1 W. Blackstone, Commentaries on the Laws of England 242-246 (1765). Without consent to jurisdiction, a suit against the king was procedurally impossible. *Id.* "The king's immunity from process was . . . personal and compelled by the structure of feudal society rather than by the nature of sovereignty." *Id.* As the monarchy evolved from a personal status into a "personification of sovereignty" the doctrine evolved into the theory that because the king could do not wrong no one else could do wrong on his behalf. The doctrine carried over after the American Revolution and was adopted by the original States. *Id.*

However, even prior to the abrogation of sovereign immunity with the enactment of G. L. c. 258, § 1, in 1975, the Commonwealth was amenable to suit in contract. See *Murdock Parlor Grate Co.* v. *Commonwealth,* 152 Mass. 28, 30 (1890). The theory was that a State consents to jurisdiction by voluntarily entering into a contract.

Quantum meruit is a theory of *recovery,* not a cause of action. It is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself. Recovery under this theory is derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of the contract. See generally 5 S. Williston, Contracts § 805 (3d

ed. 1961). In a case involving an unenforceable contract, we allowed quantum meruit recovery, basing our reasoning on the theory of unjust enrichment. *Salamon* v. *Terra,* 394 Mass. 857, 859 (1985). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Id.,* quoting Restatement of Restitution § 1 (1937). As in *Salamon, supra,* we have considered the principles of equity and morality in reaching our decision today. To bar recovery in this case on the basis that the defendant is the Commonwealth would produce a windfall for the Commonwealth which received the benefit of the plaintiff's services, especially where (as the judge found) the Commonwealth was partially responsible for Sullivan's nonperformance and failure to complete its obligations under the contract.

Moreover, in *First Nat' l Ins. Co. of Am.* v. *Commonwealth,* 376 Mass. 248, 249-251 (1978), we analyzed the application of G. L. c. 258, § 1, and its predecessor and noted that "[t]he object of [St. 1887, c. 246, a predecessor of G. L. c. 258, § 1] . . [was] to provide a convenient tribunal for the determination of claims of the character which civilized governments have always recognized." *Id.* at 250, quoting *Murdock Parlor Grate Co.* v. *Commonwealth,* 152 Mass. 28, 31 (1890). We held in *First Nat' l Ins. Co. of Am.* that a direct contractual relationship is not a prerequisite to maintaining a suit against the Commonwealth, but "[r]ather, *a claim arising in a contractual setting*" is contemplated by the waiver of immunity (emphasis added). *Id.* at 251.

2. *Contract provision as barring recovery in quantum meruit.* The defendant next contends that quantum meruit recovery is barred by a term in the contract. Article XXXII of the contract provides in part that: "No person or corporation . . . has any interest hereunder and no claim shall be made or be valid and neither the Commonwealth nor the Bureau, nor any member or agent thereof, shall be liable for or be held to pay any money except as provided in Articles III, IV, XXII, XXIII, XXVIII, XXIX, XXXI." The contention is that because this provision appears to set forth limitations on recovery and

none of the articles referred to in Art. XXXII [1] relate to recovery in quantum meruit, there could be no such recovery by Sullivan. Although the judge did not specifically address in his findings and rulings whether this provision barred Sullivan's entitlement to recovery, we assume, in light of the outcome of this case, that he concluded the provision had no such effect. We agree with this conclusion.

A contract is to be construed to give reasonable effect to each of its provisions. *McMahon* v. *Monarch Life Ins. Co.,* 345 Mass. 261, 264 (1962). "[E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties." *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 501 (1939). Although we recognize that persons are free to bargain for limited remedies in a contract, we are not persuaded that the parties intended, by this provision, to bar the type of relief sought in this case. The record is voluminous and contains the lengthy contract which was entered into between Sullivan and the Commonwealth. Article XXXII, the provision in question, is entitled: *"Claims by Others Not Valid"* (emphasis added). A more practical interpretation of Article XXXII, as quoted above, is that liability was limited to those *persons* who had signed the contract for work completed according to the specifications in the contract rather than to the *type* of *recovery* sought. Sullivan's complaint for damages in quantum meruit was not brought for work done extraneous to the terms of the contract. Moreover, the defendant does not refer to any part of the transcript or record, describing the circumstances of the agreement, in an effort to ascertain whether the parties intended to exclude recovery in quantum meruit under this boilerplate provision. See *Louis Stoico, Inc.*

---

[1] The articles mentioned relate to changes in the plans, specifications, or the contract; method of preparation of changes; differing site conditions; delays in work; the award price; furnishings and equipment and a general guaranty.

v. *Colonial Dev. Corp.*, 369 Mass. 898, 902 (1976). Our review of the record and the plain meaning of the provision leads us to conclude that Article XXXII did not preclude a claim for quantum meruit.

3. *Good faith and substantial performance.* The law in this Commonwealth is clear that one who in good faith substantially performs a contract may recover in quantum meruit. *Andre* v. *Maguire*, 305 Mass. 515, 516 (1940). The plaintiff has the burden of proving both. *Divito* v. *Uto*, 253 Mass. 239, 243 (1925). In determining whether Sullivan substantially performed under the contract, the judge's task was to examine the evidence in reference to the entire contract, what had been done, and what had been omitted. *Acme Plastering Co.* v. *Boston Hous. Auth.*, 21 Mass. App. Ct. 669, 671 (1986). Sullivan introduced evidence at trial that, at the time the contract was terminated, the balance on the punch list was valued at $32,000. The adjusted contract price was for $5,703,457.87, and as the judge found, the defendant never disputed the value of the work performed by Sullivan, which had been certified by Tedesco's chief supervising engineer at $5,703,457.87. Therefore, Sullivan "completed" the contract pursuant to Article XXIX in the contract, which provided that substantial completion of the contract would occur when the value of the work to be done was less than one per cent of the adjusted contract price. See G. L. c. 30, § 39G (1984 ed.).

In relying on *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Auth.*, 7 Mass. App. Ct. 336, 341 (1979), for support for the proposition that a quantum meruit claim may be brought against the Commonwealth, the judge stated that "[w]hen a contract is broken by one party, the other may disaffirm and seek the fair value of services and material provided under that contract." Moreover, the judge found that the Commonwealth contributed to the delay in the completion of the project. See *Frank Fitzgerald, Inc.* v. *Pacella Bros.*, 2 Mass. App. Ct. 240, 242 (1974). We conclude that the judge accepted Sullivan's testimony that he intended to complete the contract. The plaintiff attempted in good faith to complete the items contained in the punch lists in light of the plaintiff's

numerous requests to obtain monetized lists and in spite of the fact that the lists were not monetized. See *C. C. & T. Construction Co.* v. *Coleman Bros.,* 3 Mass. App. Ct. 372, 375 (1975). Cf. *S. Onorato Corp.* v. *Levin,* 348 Mass. 740 (1965). The Commonwealth contends that Sullivan's repeated failure to have an adequate number of workers on the site constituted an intentional departure from the contract and a lack of substantial performance. Generally, "[i]n the absence of special exculpating circumstances an intentional departure from the precise requirements of the contract is not consistent with good faith in the endeavor fully to perform it, and unless such departure is so trifling as to fall within the rule *de minimis,* it bars all recovery." *Andre* v. *Maguire,* 305 Mass. 515, 516 (1940).

The evidence amply supports a conclusion that there were exculpatory circumstances excusing Sullivan's performance of the contract. Cf. *Andre, supra* at 516. "[A] rule of law which would compel a court to find bad faith because of a departure of this kind . . . would be too rigid and unyielding for the practical accomplishment of justice." *Morello* v. *Levakis,* 293 Mass. 450, 453 (1936).

The amount of recovery on a claim based in quantum meruit is the fair and reasonable value of material and labor supplied to the benefiting party. 12 S. Williston, Contracts § 1477, n.18 (3d ed. 1970). See *Guenard* v. *Burke,* 387 Mass. 802, 808 (1982). "The question of what [is] fair and reasonable compensation for the services rendered is a question of fact." *Id.* See also *Boston Athletic Ass'n* v. *International Marathons, Inc.,* 392 Mass. 356, 368 (1984) (although we found no enforceable contract, it was held that one party had rendered services and the other party received a benefit; we remanded for determination of fair value of services).

The judge found that the defendant had certified the value of the plaintiff's work as of October 31, 1976, to be $5,703,457.87. It was for the judge to determine the credibility of the witnesses, including the Commonwealth's chief engineer who testified that this figure was a fair and reasonable value.[2]

---

[2] The quantum meruit award was based on change order no. 39, plus requisition no. 34, less liquidated damages for failure to complete work on

In summary, our review of the evidence and of the judge's findings does not leave us with a firm conviction that a mistake has been committed in awarding and in calculating the quantum meruit damages to Sullivan. See *Hayeck Bldg. & Realty Co. v. Turcotte*, 361 Mass. 785, 792-793 (1972). The judge applied the correct rules of law to the facts found by him.

4. *Ledge removal*. Finally, we address the Commonwealth's contention that Sullivan was not entitled to additional compensation for ledge removal which was awarded by the trial judge.

At trial, the parties disputed the amount of compensation that was owed to the plaintiff for ledge removal. Sullivan had included in its general bid an estimate for ledge removal under the "trench" method and under the "open cut" method, using estimates made by the project architect.[3] The trial judge found that no details were given as to which method should be used for particular portions of the site. In October, 1973, Sullivan informed the architect that ledge had been found. A subcontractor was called in to perform the necessary blasting and removal of ledge, and, at some point, a project architect from Tedesco observed the removal operation. He never indicated during these visits that an improper method of ledge removal was being used. Sullivan then submitted a change order seeking additional compensation for the ledge removal in the amount of $68,154.00 The architect denied the request, stating that the calculation was not in accordance with the contract terms which he claimed called for the less expensive excavation method. The architect recommended that Sullivan submit a "change order" for $15,720.00, which was the undisputed cost of extra ledge removal.[4] Sullivan did so and also filed a separate

---

time, less the value of the items remaining on the last punch list. To this was added the award for additional ledge removal.

[3] The trial judge found that in its general bid, the plaintiff submitted the following estimates for ledge removal:

| | | |
|---|---|---|
| *Trench Method* 2,000 cubic yds. X $22.00 per c.y. | = | $ 44,000.00 |
| *Open Cut Method* 10,000 cubic yds. X $16.00 per c.y. | = | $160,000.00 |
| | Total = | $204,000.00" |

[4] Articles III and IV govern change orders. Those sections address the procedure for obtaining prior authorization for deviation from plans, specifi-

"change order" for the disputed amount of $52,434.00. The architect rejected Sullivan's request for the disputed amount. The bureau accepted the architect's recommendation that the request be rejected. On March 18, 1977, Sullivan appealed the architect's denial of Sullivan's claim to the Executive Office for Administration and Finance. The appeal was rejected six days later. The judge found that Sullivan was entitled to $27,450 for additional costs for ledge removal. We turn to a discussion of the issue.

At trial, and in its main brief, the Commonwealth relied on Article V of the contract which provides in relevant part: "The designer [architect] shall decide all questions which may arise as to the conduct, quantity, quality, equality, acceptability, fitness and rate of progress of the several kinds of work and materials to be performed and furnished under the contract and shall decide all questions which may arise as to the interpretation of the plans, and specifications and as to the fulfillment of this contract on the part of the contractor." According to the Commonwealth's argument, the architect was empowered to reject the plaintiff's request for additional expenses for ledge removal (and he did) and under G. L. c. 30, § 39J,[5] the architect's decision, not having been made in bad faith or in a fraudulent, capricious or arbitrary manner, was conclusive. Therefore, (the argument continues) the judge should not have

___

cations, and other contract documents. Change orders amend the contract. Although, long after the ledge removal was accomplished, the plaintiff submitted its claim for payment on change order forms, as instructed by the architect, the plaintiff at no time sought a contract modification. The plaintiff was simply seeking payment to which it claimed it was entitled under the unamended contract. No change order was necessary or appropriate.

[5] General Laws c. 30, § 39J (1984 ed.), provides: "Notwithstanding any contrary provision of any contract for the construction . . . of any public building . . . by the commonwealth . . . when the amount of the contract is more than five thousand dollars in the case of the commonwealth . . . a decision, by the contracting body or by any administrative board, official or agency, or by an architect or engineer, on a dispute, whether of fact or of law, arising under said contract shall not be final or conclusive if such decision is made in bad faith, fraudulently, capriciously, or arbitrarily, is unsupported by substantial evidence, or is based upon error of law."

addressed the question whether the contract called for ledge removal in the manner employed by the plaintiff.

Citing several decisions of the Appeals Court involving construction contracts, the judge recognized that contracting parties may be forever bound by a third party's interpretation of their contract if they have agreed to be bound thereby and if that interpretation has been neither arbitrary nor made in bad faith. See, e.g., *Acmat Corp.* v. *Daniel O'Connell's Sons,* 17 Mass. App. Ct. 44, 46 (1983); *Perini Corp.* v. *Massachusetts Port Auth.,* 2 Mass. App. Ct. 34, 42-44 (1974). He observed, however, that in the cases applying that principle the contract has specifically stated that the interpretation would be final and conclusive. *Id.* Since no such specific language appears in Article V, the architect here had authority to interpret the contract documents "in the first instance" only, and that final interpretation was for the judge. The judge then interpreted the contract as authorizing the manner of ledge removal employed by the plaintiff. See *Merrimack Valley Nat'l Bank* v. *Baird,* 372 Mass. 721, 724 (1977).

The architect's interpretation of the contract several months after the ledge was removed has no bearing whatsoever on whether the plaintiff is entitled to recover the cost of doing that work by the trench method, and this is so even if Article V contained specific "final and conclusive" language. Article V does not address the resolution of disputes about contract interpretation arising for the first time after the relevant work has been completed, as here.

The contract is divided into sections. The first section, containing Articles I through IV, is entitled "Scope of Work." The next section contains Articles V through VIII, and is entitled "Control of the Work." Other titled sections and articles follow. Article V empowers the architect to control and direct the work as it progresses. *Perini Corp.* v. *Massachusetts Port Auth.,* 2 Mass. App. Ct. 34, 44 (1974). In the course of construction it is inevitable that numerous questions will arise concerning whether certain materials or procedures will satisfy the contract requirements. Someone must have the power to resolve the questions as they arise so that the work may move

ahead. Article V gives that authority to the designer (architect). He directs the work. Thus, the architect here might well have required the plaintiff to remove the ledge by the open cut method and, had he done so, the plaintiff would not have been entitled to be paid for removing the ledge by the more expensive trench method. The architect's decision, assuming it to be neither arbitrary nor in bad faith, see G. L. c. 30, § 39J, would have been final. That is what the cases cited by the trial judge hold. See *Acmat Corp.* v. *Daniel O'Connell's Sons, supra; J.J. Finn Elec. Serv., Inc.* v. *P & H Gen. Contractors, Inc.,* 13 Mass. App. Ct. 973 (1982); *Perini Corp.* v. *Massachusetts Port Auth., supra.* See also *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 202-206 (1945). All of those cases involve disputes concerning a contractor's entitlement to payment for work done contrary to the architect's or engineer's instructions.

The instant case is not of that stripe. Here, the architect gave the plaintiff no instructions concerning how the ledge should be removed. In fact, the architect's representative, by observing the ongoing ledge removal in silence, demonstrated acquiescence in the manner of ledge removal selected by the plaintiff. See *Perini Corp.* v. *Massachusetts Port Auth., supra* at 44-45. The architect's authority to direct the work as it progressed, and to interpret conclusively the plans and specifications and other contract documents for that purpose, is entirely distinct from any authority to resolve subsequent controversies about the plaintiff's entitlement to be paid for work done without defiance of the architect's directions. Subsequent determination of whether the plaintiff's work had met the contract requirements was for the judge, not the architect.

The Commonwealth argues that because the bureau and the Executive Office for Administration and Finance concurred in the architect's decision, the decision was final. Reliance is placed on a provision in the contract that says that "[t]he determination of the Bureau shall be final upon all questions of the amount and value of changes or method of submission and approval thereof." This defense was not raised in the trial court. It was raised for the first time in the Commonwealth's

supplementary brief filed in this court, and then only obliquely. Therefore, even if the defense had merit, which it does not, we would be reluctant to conclude that the judge's conclusion was "clearly erroneous" because of the judge's failure to take that provision into account.

*Judgment affirmed.*