FONTAINE BROTHERS, INC. vs. CITY OF SPRINGFIELD.

No. 92-P-40.

Hampden. March 3, 1993. - August 18, 1993.

Present: KASS, GREENBERG, & LAURENCE, JJ.

*Contract*, Construction contract. *Architect.*

The architect of a construction project had "final" authority as to the
"true construction and meaning" of the drawings and specifications of
the contract under the specific terms of the contract; the architect's de-
termination that the general contractor was not entitled to extra com-
pensation for certain work on the site was correct and not reviewable
where there was no allegation or evidence of fraud, bad faith, arbitrary
or capricious action or action outside his authority on the part of the
architect. [157-160]

CIVIL ACTION commenced in the Superior Court Depart-
ment on September 19, 1989.

The case was tried before *George C. Keady, Jr.,* J.

*Kathleen E. Tarpey* for the defendant.

*Philip J. Ryan* (*Michael P. Ryan* with him) for the
plaintiff.

KASS, J. Early in the construction of a fire station for the
city of Springfield, a dispute erupted about whether certain
excavation work entitled the general contractor, Fontaine
Brothers, Inc. (Fontaine), to extra compensation or was
within the scope of the work as described by the plans and
specifications. The architect for the project, exercising au-
thority to interpret the plans and specifications, ruled that
Fontaine was not entitled to extra compensation. Fontaine
brought a contract action against the city, insisting that the
architect had exceeded his authority, and secured a jury ver-
dict of $145,947.85, which, with contract interest, resulted in
a judgment of $178,820.10. We are of opinion that the archi-
tect's interpretation of the plans and specifications was bind-

ing and final and that, therefore, the city was entitled to the directed verdict for which it had timely moved. See Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974). Accordingly, we reverse the judgment and order judgment for the defendant.[1]

On the site of the fire station there had once stood a junior high school, demolished some thirteen years before the date of the construction contract. The project drawings depicted the "assumed foundation of the former Buckingham School" in a blue shaded area, overlaid by the footprint of the fire station to be built. It was removal of the residual rubble[2] of the demolished school, a manifestly unsuitable support for the foundation slab of a new building, that became the point of controversy.

Such a problem had been anticipated in the specifications prepared by the architect. The "Site Clearing" specifications required that the contractor "[r]emove existing and below-grade improvements necessary to permit construction, and other work as indicated, including all building debris from previous demolition work which is encountered below new building slabs and foundations, . . . and other locations indicated on drawings."[3] Fontaine preferred reading the specifications for the next phase of the job, "Earthwork." The earthwork specifications provided that, after the contractor had reached designated subgrade elevations, it was to notify the architect, so that he might inspect the conditions. If the materials at the designated subgrades were not suitable bearing materials, and that condition had been concealed or changed in a manner materially different from what was in-

---

[1]On the view we have taken of the case it is not necessary to consider appellate points urged by the defendant concerning the judge's instructions to the jury and certain special questions put by the judge to the jury.

[2]Among the debris that came out of the construction hole were concrete, wood, metal, pipe, brick, flights of stairs, urinals, toilets, and screens.

[3]In addition to an introductory general provision requiring removal of vegetation or other material interfering with new construction, the site clearing specifications also required removal of "unsuitable existing fill material," including underground utilities, buried tanks, paved areas, building slabs, and abandoned foundations. Another subparagraph required the contractor to remove "waste materials, abandoned tanks, building rubble . . . ."

dicated[4] in the contract documents or those encountered in normal construction activity, then the contractor was to be paid extra for the unanticipated work.

If it were our duty to interpret the contract we would have little difficulty deciding that § 02110 of the specifications, relating to site clearing, unmistakably and, indeed, repetitively requires the contractor to remove old building rubble from the job site, and that Fontaine had been forewarned by sheet No. L-1 of the architectural drawings that the job was on an old building site. Any apparent disharmony in § 02200 of the specifications, relating to earthwork, evaporates upon recognition that it deals with the bearing quality and suitability of soil at the job site, not debris. To the extent that Fontaine detected an obvious discrepancy — as it now contends — between § 02110 and § 02200 of the specifications, it should have asked for clarification if it intended to bridge the purported crevasse in its favor. *John F. Miller Co.* v. *George Fichera Constr. Corp.*, 7 Mass. App. Ct. 494, 498-499 (1979).

The question in the case, however, is not what we think the specifications mean. Rather, the question is: was the architect authorized to decide definitively what the specifications mean?

Regarding the architect's authority, art. II of the construction contract provides:

"The work shall be done under the general direction of the Architect and his decision as to the true construction and meaning of the drawings and specifications shall be final."

---

[4]The word "indicated" was itself a defined term, meaning, for purposes of the contract, "a cross-reference to graphic representations, notes or schedules on drawings, to other paragraphs or schedules in the specifications, and to similar means of recording requirements in contract documents."

As to that authority there is some amplification in art. 4 of the general conditions of the contract for construction.[5] Paragraph 4.4.4, notably, provides that the architect's decision concerning a disputed claim "shall be final and binding on the parties but subject to arbitration." A tailor-made supplementary condition, however, deletes all "references to 'arbitrators' and 'arbitration' from paragraphs 4.1.1, 4.3.2, 4.4.4, 8.3.1, 10.1.2, 11.3.9 and 11.3.10." What is left in the general conditions is that the architect's decision shall be final and binding.

Construction contracts frequently contain provisions giving an architect the power to decide disputes which arise under a construction contract. *Fred C. McClean Heating Supplies, Inc.* v. *Jefferson Constr. Co.*, 339 Mass. 356, 363 (1959). *Henry B. Byors & Sons* v. *Water Commrs. of Northborough*, 358 Mass. 354, 363 (1970). 3A Corbin, Contracts § 652 (1960). Randall & Franklin, Municipal Law and Practice § 1332 (4th ed. 1993). See *Acmat Corp.* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. 44, 49 (1983). Such is the number of details in construction drawings and specifications that inevitably there are disputes about methods, materials, and the extent of what a contractor is to do and for what the owner is to pay. It is important that someone more or less on the spot can resolve those disputes, and the architect, as we have seen, is commonly the designated referee. See *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 800-801 (1986).

Although the words "final" and "binding" have a terminal and unconditional quality, the power of the architect on a construction job is, of course, not without limit. The architect may not act in bad faith, fraudulently, arbitrarily, capriciously, or outside the scope of her or his authority. G. L. c. 30, § 39J (applies to public jobs).[6] *J.A. Sullivan Corp.* v.

---

[5]The parties used the 1987 edition of AIA Document A201, published by the American Institute of Architects.

[6]In pertinent part § 39J, inserted by St. 1961, c. 538, § 1, provides: "a decision . . . by any architect or engineer, on a dispute, whether of fact or of law, arising under said contract shall not be final or conclusive if such

*Commonwealth*, 397 Mass. at 801. *J.J. Finn Elec. Serv., Inc.* v. *P.& H. Gen. Contractors, Inc.*, 13 Mass. App. Ct. 973 (1982). *Acmat Corp.* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. at 49.

Those limitations on an architect's power of final and binding decision afford cold comfort to the plaintiff Fontaine. There is no suggestion that the architect acted fraudulently or arbitrarily,[7] and, as to the scope of his authority, interpretation of the meaning of drawings and specifications is precisely the subject matter remitted to the architect's power of decision. With no hay to be made on a claim of fraudulent or arbitrary conduct, Fontaine advances the argument that the architect may not by his power of decision change the contract. That is sound principle. See *Morgan* v. *Burlington*, 316 Mass. 413, 420 (1944), in which the court said an architect cannot take a portion of the work out of a contract and let it out on bid to another contractor. Similarly, the architect here could not have changed unit prices or, without appropriate contract change order, required a higher grade of brick facing than had been specified. Contract terms are not changed when the architect decides in the course of a job what a specification means or whether one specification trumps another. Compare *Henry B. Byors & Sons.* v. *Water Commrs. of Northborough*, 358 Mass. at 364; *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. at 801.

Trying another tack, Fontaine points to art. XLV(B) of the contract, which establishes Springfield as the venue for litigation of disputes arising out of the contract, either in Superior Court or the United States District Court. Surely, Fontaine argues, there was no point in fixing judicial venue unless claims under the agreement were ultimately subject to judicial review. The answer to the point attempted is that establishing the venue of litigation that may arise — and litigation arises routinely out of construction work — does not

---

decision is made in bad faith, fraudulently, capriciously, or arbitrarily, is unsupported by substantial evidence, or is based upon error of law."

[7]These adverbs, we may assume, cover conduct which is in bad faith or capricious.

define what is litigable and what is left for the architect to dispose of. Whether the architect acted within the scope of his authority, for example, presents a litigable issue, and the clause in the construction contract to which Fontaine refers would establish where such an action may be brought. The venue clause is wholly compatible with the proposition that, under the contract language, certain questions of contract interpretation generated by the plans and specifications are exclusively for the architect and will not be reviewed by a court.

*Judgment reversed.*
*Judgment for the defendant.*