Brassard, J.
The plaintiff in this action, a masonry subcontractor, alleges that the defendant, the general contractor of a construction project, breached the terms of the subcontract when it refused to pay for work completed but not included in the contract’s masonry specifications. The plaintiff has moved for summary judgment contending that it is entitled to judgment as a matter of law because other specifications explicitly require roofing subcontractors to perform the work in question, and any ambiguities in the specifications must be resolved against the defendant. The defendant has filed a cross-motion for summary judgment against the third-party defendant, the project owner, seeking indemnification and attorneys fees. The third-party defendant argues that summary judgment must be denied as to both motions because material issues of fact remain in dispute. For the following reasons, the plaintiffs motion for summary judgment is DENIED and the defendant’s cross-motion summary judgment is DENIED.
BACKGROUND
At or around January 1997, the plaintiff, Zeraschi and Son, Inc. ("Zeraschi”), a masonry subcontractor, filed a masonry subbid pursuant to G.L.c. 149, §44F(2) in the construction of the New Chelsea Court House (“Project”). The defendant, R.W. Granger & Sons Inc. (“Granger”),[2] was subsequently awarded the general contract for the Project, and entered into a prime contract with the third-party defendant, the Commonwealth of Massachusetts Division of Capital Planning and Operations (“DCPO’).[3]
On February 26, 1997, after being awarded the masonry subcontract, Zeraschi entered into a subcontract with Granger. The subcontract states in pertinent part,
The Subcontractor agrees to furnish all labor and materials required for the completion of all work specified in Section No. 04101 of the specifications for Masonry and the plans referred to therein and addenda No 1, 2, 3 and 4 for the [Project] as prepared by Schwartz/Silver Architects, Inc. . . .
Part 2 of the Masonry specifications, §04101, entitled “Products,” .states in part:
2.12 EMBEDDED FLASHING MATERIALS:
1. Type 1: Fabricate from 16 oz. (0.0216 inch) copper. Fabricate through-wall metal flashings embedded in masonry with ribs formed in dovetail pattern at 3-inch intervals along length of flashing to provide a three-way integral mortar bond and weep-hole drainage.
1. Fabricate metal expansion joint strips from sheet metal indicated above, formed to shape indicated.
Type 2: Rubberized Asphalt Sheet Flashing: Composite flashing product consisting of 32-mil-thick pliable and highly adhesive rubberized asphalt compound bonded completely and integrally to 8 mil-thick, high-density, cross-laminated polyethylene film to produce an overall thickness of 40 mils.
*188 1. Extent: Use flashing type 2 for fully concealed applications to the greatest extent possible, but not where exposed to view or sunlight, not where joint sealant is in contract, not where flashing type 2 must span over an opening or cavity, and not where the self-adhesive properties make the flashing impossible to install. In these instances, use flashing type 1.
When a question arose at a job meeting on April 30, 1998, as to which subcontractor was responsible for completing work known as “lead coated copper flashing,” Granger contacted Schwartz/Silver (“architects”), the architects of the Project. By letter dated May 5, 1998, the architects responded that “flashings are indicated on the drawings without noted indications of subcontract ownership, although materials are sometimes noted.” The letter further explained:
The ownership of the metal flashing is indicated in the contract documents by language in the specification sections. 07601 includes metal flashings and counter flashings, except throughwalls masonry flashings are masonry work in 04101; 04101 includes throughwall flashings in masonry assemblies. “Throughwall masonry flashings” and “throughwall flashings in masonry assemblies" mean flashings that are embedded or sandwiched in masonry construct; that is, the flashing goes through the masonry assembly. In general, this means that the mason owns horizontal head and sill flashings at window and curtainwall openings and other locations where the flashing goes through the masonry; flashing at other locations (such as curtainwall opening heads and jambs) belong to the roofer.
Zeraschi completed all the original masonry subcontract work. Thereafter, Zeraschi was ordered by DCPO, through Granger, to perform work requiring lead coated copper flashing. Zeraschi, who believed that such work was the responsibility of roofers and flashers, did not include the cost to furnish or install lead coated copper flashing in its bid. Consequently, Zeraschi performed this work under protest and made a claim for costs totaling approximately $40,412.10 to Granger.
Granger submitted Zeraschi’s request for additional costs to DCPO, who subsequently denied Zeraschi’s claim. In so doing, DCPO consulted the architects to again clarify whether the masons or roofers and flashers were responsible for lead coated copper flashing. By letter dated January 15, 1999, the architect recommended that Zeraschi’s request be rejected because the disputed lead coated copper flashing work was “part of the contract work.” On February 9, 1999, the architect provided an additional letter in support of its recommendation. In pertinent part, the letter stated,
[T]he relevant distinction is between what is a throughwall flashing, or throughwall masonry flashing (there is no meaningful difference between these two expressions for the details on this set of construction documents) and other metal flashings; the former will belong to Section 04101, and the latter to 07601 . . . The assignment of a detail to 070601 means that it is not a throughwall flashing; the assignment of it to 04101 means that it is throughwall flashing.
On March 19, 1999, the DCPO adopted the architect’s recommendation, rejected Zeraschi’s claim, and directed Zeraschi to “furnish and install lead coated copper flashing by the masonry contractor.” Zeraschi appealed the architect’s decision and was ultimately denied costs for the flashing.
On February 3, 2000, Zeraschi filed the present action alleging breach of contract in violation of G.L.c. 149, §29 (Count I), and quantum meruit (Count II). On March 3, 2000, Granger and Guaranty filed a third-party complaint against the DCPO seeking indemnification (Count I), and attorneys fees (Count II).
DISCUSSION
Summary judgment is appropriate when there are no material facts in dispute and when the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56. The moving party bears the burden of affirmatively demonstrating the absence of a triable factual issue and of showing that it is entitled to judgment as a matter of law. Pederson v. Time Inc., 404 Mass. 14, 16-17 (1989). Once the moving party demonstrates the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a material factual dispute. Id. at 17. Summary judgment is a “device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved.” Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976).
As a threshold issue, the DCPO argues that language contained in the DCPO’s “Notice to Contractors” coupled with G.L.c. 30, §39J[4] empowered the architect to order Zeraschi to perform the lead coated copper flashing, and that the decision, not having been made in bad faith or in a fraudulent, capricious or arbitrary manner, was conclusive. The Notice states in pertinent part,
The [Architect] shall decide all questions which may arise as to the conduct, quantity, quality, equality, acceptability, fitness, and rate of progress of the several kinds of work and materials to be performed and furnished under this contract, and shall decide all questions which may arise as to the interpretation of the plans and specifications and as to the fulfillment of this contract on the part of the contractor.
In opposition, Zeraschi contends that the architect’s decision is reviewable because the Notice does not *189 state that the architect’s decision is “binding.” Moreover, Zeraschi contends that the architect committed an error of law when it determined, on the basis of ambiguous drawing plans, that Zeraschi was responsible for lead coated copper flashing.
An architect’s authority to direct the work as it progresses and to interpret conclusively the plans and specifications and other contract documents for that purpose, is entirely distinct from any authority to resolve subsequent disputes about a subcontractor’s entitlement to be paid for work done without defiance of the architect’s directions. See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 801 (1986). In J.A. Sullivan, the project owner ordered the plaintiff to remove a ledge from a site where neither the contract, drawings nor plans, specified the method of ledge removal. Although the architect never instructed the plaintiff to use a particular removal method, it nonetheless recommended that the project owner deny the plaintiffs request for additional compensation on the ground that the terms of the contract called for a less expensive removal method. Noting that the contract only empowered the architect to “direct work as it progressed,” the court held that even if the contract had “final and conclusive language,” any subsequent determination as to whether the plaintiff was entitled to be paid for work done without defiance of the architect’s directions was for the judge, not the architect. Id.
Under J.A. Sullivan, the architect’s interpretation of the masonry specifications and drawings has no bearing whatsoever on whether Zeraschi is entitled to recover the cost of installing the lead coated copper flashing in accordance with the architect’s interpretation, and this is so even if the contract contained “binding” language. The court finds that the architect’s determination that Zeraschi was not entitled to compensation is, therefore, reviewable.
The issue then becomes whether summary judgment is appropriate in this case. Zeraschi argues that under G.L.c. 149, §44F[5] all the masonry requirements should have been in one section in the specifications, and because the term “lead coated copper flashing” is absent from the masonry specifications but present in the flashing and metal specifications, it is entitled to judgment as a matter of law. Zeraschi further contends that any ambiguity in the specifications must be resolved against the DCPO. In opposition, the DCPO argues that a material issue of fact exists as to whether a reasonable masonry subcontractor would have interpreted the entire contract, including the specifications, drawings and plans, to exclude lead coated copper flashing from its subbid. DCPO also argues that Zeraschi's failure to bring the alleged ambiguities in the masonry specifications to DCPO’s attention prior to bidding precludes recovery.
The test for resolving disputes as to which party bears the blame for a construction contract’s ambiguity is the degree of obviousness of the omission, error, or discrepancy in the specifications. John F. Miller Co., Inc. v. George Fichera Construction Corp., 7 Mass.App.Ct. 494, 498-99 (1979). Thus, if the discrepancy is subtle, so that a subcontractor who examines the specifications reasonably conscientiously might miss a requirement which is out of sequence or ineptly expressed, the burden of the error falls on the issuer of the specifications. Id. Conversely, a subcontractor who is presented with an obvious omission, inconsistency or discrepancy is required to ask for clarification prior to bidding “if he intends to bridge the crevasse in his favor.” Id.
Evidence of business custom is generally admissible to determine whether an ambiguity with respect to duty of subcontractors is subtle or glaring. See id.; see also Hardware Specialities, 2 Mass.App.Ct. 277, 279 (1974). In Hardware Specialities, the court allowed a hardware subcontractor seeking to recover the cost of installing hardware from the general contractor to introduce evidence regarding the custom of the hardware industry. In that case, the specifications governing the hardware subcontractor were silent on the question of installation, while other specifications explicitly required carpenters to install hardware. Although the court noted that ordinarily “one subcontractor should not be permitted to escape the obligations he has assumed under his subcontract by pointing to the obligations which a second subcontractor may have assumed in a separately negotiated contract between himself and the general contractor,” because evidence of custom in the hardware trade confirmed that the subcontractor was not to install hardware, the specification’s ambiguity was construed in favor of the subcontractor to allow the recovery of costs. Id. at 282. Likewise, in John F. Miller, 7 Mass.App.Ct. at 499, the court held that because evidence of custom in the plumbing industry varied as to what is considered toilet room accessories and who is responsible for accessory installation, the plumbing subcontractor was justified in not combing other specifications for provisions related to toilet room accessories. Rather, the discrepancy in the plumbing specifications was subtle, and thus the subcontractor did not breach the subcontract when it refused to furnish and install certain toilet room accessories.
In the present case, Zeraschi has submitted the affidavit of its president, Robert Zeraschi. In pertinent part, the affidavit states that:
Zeraschi has never fabricated or furnished lead-coated copper flashing. It is not customary for masons to fabricate or supply lead-coated copper flashings, as Zeraschi was ordered to do on this Project. That is a craft customarily performed by the roofing or sheet metal subtrades.
The DCPO, however, has submitted the affidavit its Project Manager, William Dulong, in which he states:
*190 Based upon my knowledge and experience in the construction industry the [Architect’s] confirmation of the assignment of flashing responsibility between Zeraschi and the roofing subcontractor is consistent with the contract documents and customary construction practice.
Thus, the parties dispute whether it is the custom in the masonry industry to install lead coated copper flashing.[6] Because this factor may well be determinative as to whether the ambiguity in the masonry specifications is subtle or glaring, summary judgment is not appropriate. For these reasons, Zeraschi’s motion for summary judgment is DENIED.
ORDER
For the foregoing reasons, the plaintiffs motion for summary judgment is DENIED. The defendant’s cross-motion for summary judgment is DENIED.

 United States Fidelity and Guaranty Company (“Guaranty”), another defendant in this action, provided Granger with the payment bond surety required by c. 149, 829.

 The DCPO is presently known as the Commonwealth of Massachusetts Division of Capital Asset Management.

 General Laws c. 30, §39 J provides “notwithstanding any contrary provision of any contract for the construction ... of any public building ... by the commonwealth ... a decision, by the contracting body or by any administrative board, official or agency, or by an architect or engineer, on a dispute, whether of fact or of law, arising under said contract shall not be final or conclusive if such decision is made in bad faith, fraudulently , capriciously, or arbitrarily, is unsupported by substantial evidence, or is based upon error of law.”

 Under G.L.c. 149, §44F(1), “Such specifications shall have a separate section for each of the following classes of work ... (a) roofing and flashing; . . . (Q) masonry work . . . Each separate section . . . shall require the subcontractor to install all materials to be furnished by him under such section other than material which in the opinion of the awarding authority is not customary under then current trade practices for such subcontractor to install and the installation of which is expressly required by another section of the specifications.”

 Additionally, neither party has offered any expert testimony to assist the court in interpreting the complex construction drawings contained in the summary judgment record.