PLURALITY OPINION
CHARLES W. SEYMORE, Justice.
In this breach of contract case, Tribble & Stephens Company (“T & S”) appeals a summary judgment in favor of RGM Constructors, L.P. (“RGM”)[1] on the grounds that: (1) RGM failed to comply with a contractual condition precedent to litigation; (2) there were disputed fact issues concerning RGM’s performance under the *633 contract; (3) the trial court erred in: (a) sustaining RGM’s objections to T & S’s summary judgment evidence, and (b) refusing to grant leave to amend that evidence; (4) the trial court granted RGM more relief than requested; and (5) the trial court erred by granting RGM’s partial summary judgment motion on T & S’s deceptive trade practices claims and granting sanctions under the DTPA[2] against T & S. We hold that the trial court erred in (1) granting RGM’s summary judgment motion because fact issues exist as to RGM’s performance under the contract; (2) in granting summary judgment in connection with T & S’s reformation claim; and (3) in granting RGM’s partial summary judgment motion on T & S’s DTPA claims and in granting sanctions on those claims against T & S. Further, because it is unclear whether RGM agreed to be bound by the condition precedent as argued by T & S in its summary judgment motions, a fact issue exists as to the parties’ intent. We reverse the judgment of the trial court and remand.[3]
I. Background
In 1997, T & S, as general contractor, was hired by Remington Suites Austin, L.P., as owner (“Remington”), to build an Embassy Suites hotel in Austin (the “project”). The agreement between Remington and T & S was an American Institute of Architects (“AIA”) form document A101 with modifications (the “prime contract”). The prime contract incorporated by reference AIA form document A201, entitled “General Conditions of the Contract for Construction” (hereinafter “General Conditions”). On August 21, 1997, T & S entered into a subcontract with RGM (the “subcontract”), in which RGM agreed to perform the concrete formwork[4] on the floors and ceilings of the hotel. The subcontract is not a standard AIA form.
During the course of RGM’s work, problems arose. As early as November 1997, T & S notified RGM its formwork may need remediation to correct offsets, fins, or other defects.[5] Specifically, by letter dat *634 ed November 17, 1997, T & S’s project manager, Bart Dansby, advised RGM as follows:
Please be reminded that the bottom of the suspended slabs on level 3 through the roof will be exposed concrete. We have encouraged your field personnel to be cognizant of this condition in order to minimize the remedial work that might be necessary to correct offsets, fins or other defects in the exposed concrete surface caused by your formwork.
Subsequently, T & S notified RGM that its work was unacceptable to the project architect, Stuart Campbell, because the formed concrete surfaces visible to the public in some of the guest suites and corridors exceeded the tolerances for irregularities as required in the contract documents. Although RGM attempted to rectify the problems, Campbell again rejected RGM’s work during subsequent inspections.
On March 19, 1998, T & S sent a letter to RGM (the “default letter”), in accordance with the terms of the subcontract, advising RGM that Campbell had “rejected the quality of the exposed to view formed concrete surface[s].” The letter also stated that “[pjursuant with specification section 03300-3.10B.1 we must direct your company to return and perform additional repair work....” The default letter indicated that the problem with RGM’s work was primarily with form offsets. Also, as permitted in the subcontract, T & S advised RGM that if it did not begin remedial work or establish an acceptable plan to address the problems within 72 hours, T & S would be forced to hire a third party to perform the work on RGM’s behalf. On March 24, T & S accepted a bid from the painting subcontractor, Co-burn & Company (“Coburn”), to float the form offsets which T & S claimed were the result of RGM’s work.
RGM’s project engineer, Martin Morel-lo, met with Campbell on March 31 to discuss the stage of completion for RGM’s work. Campbell explained to Morello that the offsets in the concrete surfaces needed to be smooth and level, with no abrupt offsets. At the meeting, Morello did not discuss his belief that RGM had performed its work in accordance with the contract specifications.
In. June 1998, RGM submitted pay requests No. 8 and No. 9, requesting final payment on the contract.[6] In September of 1998, T & S submitted invoices to RGM for work done by Coburn, advising RGM that its share of the costs for Coburn’s remedial work was $12,564. In response, RGM’s attorney sent a demand letter to T & S, informing T & S that RGM believed its work was performed in accordance with the contract terms and within the contract tolerances, and requesting full and final payment under the subcontract.
RGM filed suit against T & S in Travis County to recover the unpaid balance of the contract price. Upon motion to transfer filed by T & S, venue was transferred to Harris County. T & S filed counterclaims against RGM for breach of contract, breach of warranty, DTPA violations, promissory estoppel, and indemnification.
RGM filed a motion for partial summary judgment seeking dismissal of T & S’s DTPA claims and the trial court granted the motion. Subsequently, the court also issued an order finding that T & S’s DTPA action was groundless and granted sanctions against T & S. Meanwhile, both parties submitted competing motions for summary judgment on the additional claims. The trial court granted RGM’s summary *635 judgment motion and denied T & S’s motions for summary judgment. This appeal ensued.
II. Analysis
In two issues, T & S argues the trial court erred in denying its motion for summary judgment and in granting RGM’s summary judgment. Specifically, in its first issue, T & S contends it was entitled to judgment as a matter of law because RGM failed to fulfill a contractual condition precedent to litigation and RGM failed to raise any viable grounds to defeat T & S’s right to summary judgment. In its second issue, T & S presents five sub-issues for our review:
• Did RGM establish entitlement to summary judgment as a matter of law?
• Were there genuine issues of material fact precluding summary judgment for RGM?
• Did the trial court err by sustaining all of RGM’s objections and striking T & S’s evidence without first granting T & S the right to amend its evidence as provided by Texas Rule of Civil Procedure 166a(f)?
• Did the trial court err by granting RGM more relief than it requested in its motion for summary judgment?
• Did the trial court err by granting RGM partial summary judgment on T & S’s DTPA claims and granting sanctions against T & S on the ground that it filed its DTPA claims in bad faith?
A. Standard of Review
The propriety of a summary judgment is a question of law. Accordingly, we review the trial court’s decision de novo. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex.1994); Taub v. Aquila Southwest Pipeline Corp., 93 S.W.3d 451, 462 (Tex.App.-Houston [14th Dist.] 2002, no pet.). A summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and he is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). We review the summary judgment evidence in the light most favorable to the nonmovant, indulging every inference and resolving all doubts in his favor. Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex.1997); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 549 (Tex.1985). If the movant establishes a right to summary judgment, the burden shifts to the nonmovant to raise any issues that would preclude summary judgment. Pennwell Corp. v. Ken Assocs., Inc., 123 S.W.3d 756, 760 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).
When cross-motions for summary judgment are filed, a reviewing court examines all of the summary judgment evidence presented by both sides, determines all questions presented, and if reversing, renders such judgment as the trial court should have rendered. Bradley v. State ex rel. White, 990 S.W.2d 245, 247 (Tex.1999); Vill. of Pheasant Run Homeowners Ass’n v. Kastor, 47 S.W.3d 747, 749-50 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We may also remand in the interests of justice. Lidawi v. Progressive County Mut. Ins. Co., 112 S.W.3d 725, 730 (Tex.App.-Houston [14th Dist.] 2003, no pet.); W.W. Laubach Trust/The Georgetown Corp. v. The Georgetown Corp.[W.W. Laubach Trust, 80 S.W.3d 149, 155 (Tex.App.-Austin 2002, pet. denied). When both parties move for summary judgment, each party must carry its own burden and neither can prevail due to the other’s failure to meet its burden. W.H.V., Inc. v. Assocs. Hous. Fin., LLC, 43 S.W.3d 83, 87-88 (Tex.App.-Dallas 2001, pet. denied).
B. RGM’s Summary Judgment
Because resolution of T & S’s first appellate issue is dependent in part on resolution of its second issue, we begin with T *636 & S s claim that the trial court erred in granting RGM’s summary judgment motion.
T & S argues that RGM failed to demonstrate it was entitled to judgment as a matter of law because there were material fact issues regarding RGM’s performance under the subcontract such as the extent to which the concrete work was exposed to public view, the applicable tolerance levels for irregularities under the contract documents, and whether RGM’s finished work was within those tolerance levels. Contrarily, RGM argues that when properly construed, the contract documents establish it fully performed its contractual obligations. We examine the contract documents to ascertain what performance was required and set out the contract terms pertinent to this appeal.
1. The Subcontract Terms
In paragraph 1.1 of the subcontract, RGM agreed to perform the concrete formwork “subject to the final approval of the Architect ... in accordance with and reasonably inferable from the Contract Documents” and also agreed to perform the work as defined in those documents. Paragraph 1.2 of the subcontract, lists the “Contract Documents” as attachments A through G. Attachment A to the subcontract provides, in part:
Subcontractor’s work specifically includes, but is not limited to the following:
(SPECIFICATION SECTION) (DESCRIPTION TITLE)
Division 1 General Requirements
Division 2 Section 03100 Concrete Formwork
Attachment B to the subcontract, entitled “Current Drawings,” sets out various drawings made a part of the subcontract and also includes, “Specifications/Project Manual.” The Specifications from the Project Manual contain in all a listing of 16 “Divisions” and under each Division, a number of sections are listed. For example:

Division 01 General Requirements

015 Construction Documents
040 Coordination
050 Field Engineering & Layout
[[Image here]]

Division 02 Sitework

100 Site Preparation
160 Trench Safety
200 Earthwork
220 Excavating and Backfilling for Structure
[[Image here]]
Concrete Work o o Os , ' . ⅛
Concrete Formwork[7] O O
Concrete Reinforcement O O
Cast-in-Plaee Concrete Co o O
[[Image here]]
These divisions are standard throughout the construction industry and are promulgated by the Construction Specifications Institute.
Under section 03100, the scope of RGM’s work was defined as “[pjrovide formwork for cast-in-place[8] and precast *637 concrete,” as well as work defined in “[a]p-plieable [sections of Division 3.” Also, under paragraph 1.03 of section 03100, entitled “Quality Assurance,” the following is set out:
A. Standards: Except as modified hereinafter, comply with applicable provisions and recommendations of ACI-347, “Guide to Formwork for Concrete” and ACI-301, Chapter 4, “Specification for Structural Concrete for Buildings.”[9]
Paragraph 1.2 in the subcontract contains what is known in the construction industry as a “flow down” clause which provides:
Subcontractor binds himself to T & S for the performance of Subcontractor’s Work in the same manner as T & S is bound to Owner for such performance under T & S’s contract with Owner.[10]
2. Construing the Contract Documents
In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex.2003); Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983). To achieve this objective, we examine and consider the entire writing in an attempt to harmonize and give effect to all provisions of the contract so that none are rendered meaningless. Webster, 128 S.W.3d at 229; Coker, 650 S.W.2d at 393. No single provision will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument. Webster, 128 S.W.3d at 229; Coker, 650 S.W.2d at 393.
We first determine whether it is possible to enforce the contract documents as written, without resort to parol evidence. Webster, 128 S.W.3d at 229. Determination of ambiguity in a contract is a question of law for the court. Id. (citing Coker, 650 S.W.2d at 394); Highlands Mgmt. Co., Inc. v. First Interstate Bank of Tex., N.A., 956 S.W.2d 749, 752 n. 1 (Tex.App.-Houston [14th Dist.] 1997, pet. denied). A contract is unambiguous if it can be given a definite or certain legal meaning. DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex.1999). If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties’ intent. Webster, 128 S.W.3d at 229. A court need not embrace strained rules of construction to avoid an ambiguity at all costs. Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex.1996). Instead, we construe a contract from a utilitarian perspective, keeping in mind the particular business activity sought to be served. Id. Because a fact issue arises as to the intent of the parties when a contract contains an ambiguity, the granting of a summary judgment is improper. Moncrief v. ANR Pipeline Co., 95 S.W.3d 544, 546-47 (Tex.App.-Houston [1st Dist.] 2002, pet. denied); W.W. Laubach Trust, 80 S.W.3d at 155.
To determine if a contract is ambiguous, we may examine extrinsic evidence to interpret the contractual terms used by the parties and extrinsic evidence of the circumstances surrounding execution of the contract. See Nat’l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex.1995); Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex.1981). However, extrinsic *638 evidence may not contradict or vary the meaning of the explicit language of the written contract. Nat’l Union Fire Ins., 907 S.W.2d at 521. We examine that evidence only to assist us in understanding the object and purpose of the contractual language. Id.
3. Did RGM establish its entitlement to summary judgment as a matter of law?
In its summary judgment motion, and on appeal, RGM argued that it fully complied with all of its obligations under the subcontract and, therefore, it is entitled to be paid in full.[11] As the movant on the issue of performance, RGM had the burden to establish, as a matter of law, what performance was required under the subcontract and that it fulfilled those requirements. See Augusta Court Co-Owners’ Ass’n v. Levin, Roth & Kasner, 971 S.W.2d 119, 122 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). If RGM failed to meet that burden, we must reverse the judgment and remand for further proceedings. Id. at 121-22.

a. Satisfaction clause

Notably, the subcontract contains a “satisfaction clause.” In other words, RGM agreed to perform its work subject to the “final approval” of the project architect.
It is well established that a contract may require performance by one party to be subject to the satisfaction of the other party, or a designated third party such as an architect or engineer. See Delhi Pipeline Corp. v. Lewis, Inc., 408 S.W.2d 295, 297-98 (Tex.Civ.App.-Corpus Christi 1966), overruled on other grounds by Tenneco Oil Co. v. Padre Drilling Co., 453 S.W.2d 814 (Tex.1970). Construction contracts commonly contain satisfaction clauses. See, e.g., Tex. Dep’t of Transp. v. Jones Brothers Dirt & Paving Contractors, Inc., 92 S.W.3d 477, 481 (Tex.2002) (listing cases addressing satisfaction clauses in construction contracts); Black Lake Pipe Line Co. v. Union Constr. Co., 538 S.W.2d 80, 88-89 (Tex.1976), overruled in part on other grounds by Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex.1989) (same). Generally, a satisfaction clause will be upheld unless it is shown that the arbiter of performance under the contract decided the matter due to fraud, misconduct, or such “gross mistake” that it implies bad faith or the failure to exercise honest judgment. See Westech Eng’g, Inc. v. Clearwater Constructors, Inc., 835 *639 S.W.2d 190, 202-03 (Tex.App.-Austin 1992, no writ); see also Jones Brothers, 92 S.W.3d at 481 (noting the standards applicable to satisfaction clauses); First-Wichita Nat’l Bank v. Wood, 632 S.W.2d 210, 214 (Tex.App.-Fort Worth 1982, no pet.) (noting cases concerning an architect’s authority to pass final approval on construction work). However, it must appear from the express terms of the contract that the parties intended determination by a third party to be final; such a provision may not be implied. Delhi Pipeline, 408 S.W.2d at 298.
If the architect’s satisfaction is required, we should refrain from substituting our judgment for that of the architect. See Jones Brothers, 92 S.W.3d at 483. Indeed, an architect’s decision cannot be set aside by proving that some other architect may have acted or decided an issue differently or “simply on a conflict of evidence as to what []he ought to have decided. This must be true, because any other rule would simply leave the matter open for a court or jury to substitute its judgment and discretion for the judgment of the [architect].” Westech Eng’g, 835 S.W.2d at 203 (quoting City of San Antonio v. McKenzie Constr. Co., 136 Tex. 315, 150 S.W.2d 989, 996 (1941)).
In this case, Paragraph 1.1 of the subcontract provides that RGM agrees to perform its work “subject to the final approval of the ArchiteeVEngineer ....” (emphasis added). Further, in Paragraphs 2.1 and 2.4, RGM agreed that its receipt of payment was dependent on “acceptance and approval” of its work by the project architect, and in Paragraph 2.1, RGM expressly accepted the “risk” that the “Owner may reject all or a portion of [RGM’s] work.” Thus, under the express language of the subcontract, RGM agreed to perform its work subject to Campbell’s “final approval.” However, in its motion for summary judgment, RGM failed to prove that Campbell approved its performance under the subcontract.
On appeal and in its response to T & S’s no-evidence summary judgment motion, in which T & S asserted that RGM was required to perform to Campbell’s satisfaction, RGM argues that under Paragraph 4.4 of the General Conditions, the parties were not bound to the architect’s decision because Campbell’s decision was not “final and binding on the parties.” RGM also distinguishes cases pertaining to an architect’s satisfaction by asserting that its presentment of a claim to the architect could not be a “condition precedent under the subcontract” because the parties here had not agreed to be bound by the architect’s decision. RGM’s argument fails for two reasons.[12]
First, RGM has confused the architect’s role in the two, separate issues raised in this appeal: (1) whether RGM established as a matter of law that it fully performed under the contract, notwithstanding the architect’s rejections of its work, and (2) whether RGM agreed to present its “claims” to the architect as a condition *640 precedent to this litigation.[13] This duality in the architect’s role is not only evident from the parties’ arguments, but also under the General Conditions in the contract. For example, paragraphs 4.1 and 4.2 of the General Conditions pertain to the architect’s role in the administration of the contract, including his approval of the work performed. Indeed, paragraph 4.2.13 of the General Conditions provides that the architect’s decisions on matters relating to “aesthetic effect” will be final. Consequently, Campbell’s decisions concerning the quality of work performed are distinct from paragraphs 4.3 and 4.4 of the General Conditions, which address his role as arbiter of claims and disputes under the contract documents. As RGM interprets the subcontract, RGM was not required to satisfy Campbell because his decision concerning disputes was not “final.” However, Campbell’s decision regarding disputes under paragraph 4.4 of the General Conditions has no bearing on whether RGM agreed to perform the concrete formwork subject to Campbell’s satisfaction.
Another problem with RGM’s argument is its reliance on paragraph 4.4 of the General Conditions to support its contention that Campbell’s approval of its work was not required. RGM has steadfastly argued that the General Conditions, particularly the claims and disputes provisions under paragraph 4.4, do not apply to its subcontract. RGM cannot avoid the claims procedure contained under Article 4 of the General Conditions, while asserting that it is excused from performing to Campbell’s satisfaction under those same provisions. If we assume the General Conditions apply, paragraph 4.2.13, expressing that the architect’s “decisions on matters relating to aesthetic effect will be final” would apply.
Furthermore, under the express terms of the subcontract, in the event of a conflict between its provisions and the contract documents, the subcontract language controls. Because Paragraph 4.4 of the General Conditions is in conflict with the express “final approval” language of the subcontract in Paragraph 1.1, the language of the subcontract controls and RGM is bound to perform its work subject to Campbell’s “final approval.” Cf. Jones Brothers, 92 S.W.3d at 482-83 (noting that all parties involved in a construction project may not necessarily be bound by the satisfaction clause); Black Lake Pipe Line Co., 538 S.W.2d at 88-89 (noting that the architect’s approval was not binding on the owner, but was on the contractors).
Neither party directly addressed whether the finish of the formed surfaces fell within an “aesthetic effect” under the prime contract or other issues raised regarding Campbell’s satisfaction in their summary judgment motions; however, as movant for summary judgment on the issue of performance under the subcontract, this omission is fatal only to RGM. See, e.g., Augusta Court, 971 S.W.2d at 122-23 (finding that unaddressed contractual issue was fatal to summary judgment movant only). Because RGM failed to conclusively prove it performed to the architect’s satisfaction as required under the express terms of the subcontract or failed to prove that Campbell’s rejection was due to fraud or misconduct, RGM did not establish entitlement to judgment as a matter of law.[14] See id. at 123.
*641 Also, when a contract requires performance to the satisfaction of an architect or engineer, the expert testimony of that architect or engineer may be admissible to determine if the required work was reasonably within the scope of the contract. See Jensen Constr. Co. v. Dallas County, 920 S.W.2d 761, 768 & n. 6 (Tex.App.-Dallas 1996, writ denied) (citing Black Lake Pipe Line Co., 538 S.W.2d at 88-89); see also Goode v. Ramey, 48 S.W.2d 719, 721 (Tex.Civ.App.-El Paso 1932, writ ref'd) (admitting testimony of witness that plumbing contractor’s work met contract specifications). T & S provided an affidavit from Campbell specifically stating he rejected RGM’s work. RGM objected to the affidavit, claiming various statements violated the parol evidence rule, and the trial court sustained the objections. However, Campbell’s deposition, reflecting he had rejected the formwork and that “it was common knowledge” RGM served as the subcontractor on the formwork, was attached to RGM’s summary judgment motion. Thus, RGM’s own summary judgment evidence indicated Campbell rejected RGM’s work, raising a fact issue as to whether RGM’s performance under the subcontract satisfied Campbell.[15]

b. Applicable specifications

Other fact issues exist concerning RGM’s performance under the contract. T & S’s March 19, 1998 default letter specifically referred RGM to the specifications in section 03300, paragraph 3.10(B)(1.), when requesting RGM come back and perform the remedial work. Paragraph 3.10(B)(1.) provides as follows:
1. Repair exposed-to-view formed concrete surfaces, where possible, that contain defects which adversely affect the appearance of the finish. Remove and replace the concrete having defective surfaces if the defects cannot be repaired to the satisfaction of the Architect. Surface defects, as such, include color and texture irregularities, cracks, spalls, air bubbles, honeycomb, rock pockets; fins and other projections on the surface; ... [16]
The parties do not dispute that the concrete surfaces at issue in this case are “formed surfaces,” which according to ACI-347, relied on by RGM, equates to the “finish of exposed concrete.” Further, the work rejected by Campbell consisted *642 of the finished surfaces of the concrete formwork. However, RGM asserts that section 03300 does not apply to its work under the contract. Neither party addresses whether the subcontract is ambiguous concerning the applicable specifications. However, reading the contract as a whole, we find that it is ambiguous.[17]
Attachment A to the subcontract expressly incorporates by reference Division 1 and Division 2 of the project specifications, as follows:
(SPECIFICATION SECTION) (DESCRIPTION TITLE)
Division 1 General Requirements
Division 2 Section 03100[18] Concrete Formwork
Thus, the subcontract expressly directs RGM to the specifications found in “Division 2 Section 03100,” but any reference to Division 3, covering “Concrete Formwork,” is expressly omitted although it clearly applies to RGM’s work. One reasonable interpretation of this omission is that the subcontract contains a typographical error and the parties actually intended to refer to “Division 3.” Assuming Division 3 applies to RGM’s work, the entirety of that Division, including section 03300, would apply.[19]
The conclusion that section 03300 applies to RGM’s work is supported by the fact that the scope of RGM’s work is defined in section 03100 as providing “form-work for cast-in-place and precast concrete.” Section 03300 applies to cast-in-place concrete. Accordingly, that section applies to RGM’s work. Moreover, section 03100, 1.02(B), entitled “Work of Other Sections,” specifically states “Applicable Sections of Division 3,” indicating other sections of Division 3 also apply.[20] Finally, as a preface to the specifications listed, the subcontract provides that RGM’s work specifically includes those specifications listed, but is not limited to them. Were we to conclude that only section 03100 applies, these provisions in the subcontract would be rendered meaningless.
However, it is also reasonable to assume that the inclusion of section 03100 in the subcontract was intended as a limitation of specifications. Also, Division 1, entitled *643 “General Requirements,” contains general provisions that apply to the entire project, not just specifically to concrete formwork. Therefore, its inclusion in the specifications is logical. Assuming that Division 2 pertains to general requirements regarding the overall project, it is equally plausible that Division 2 was intended to be referenced and the omission of a reference to Division 3 was intended to limit the subcontract to only Section 03100 of that Division.[21]
In sum, we are unable to give the specifications a definite and certain legal meaning. Although RGM’s work included cast-in-place concrete, the specifications applicable to that work were not expressly set out in the subcontract. It is unclear if the parties intended all the specifications under Division 3 to apply to RGM’s work or only section 03100. Because the subcontract is ambiguous relative to specifications for RGM’s work, a fact issue exists regarding the intent of the parties and summary judgment in RGM’s favor was error.[22]
c. “Exposed concrete”
RGM argued in its summary judgment motion that section 03300 does not apply to its formwork because 03300 sets forth the repair standards for defects in “exposed-to-view” formed concrete surfaces, as opposed to “exposed concrete.” RGM contends the surfaces at issue were to receive an acoustical spray-on texture because they were “exposed concrete” as that term is defined in the subcontract. Consequently, RGM contends section 03300 is inapplicable because it pertains to “exposed-to-view” concrete. However, this argument presupposes that “exposed concrete” surfaces under the subcontract could not also be “exposed-to-view” concrete surfaces,[23] and with this we disagree.
Section 03100, 1.03(B.) defines three types of concrete relative to the project as follows:
1. Exposed Concrete: Concrete exposed-to-view on interior and/or exterior including concrete which will receive finish materials, such as paint and wallcov-ering, applied directly to its surface. Not included is exposed concrete in mechanical and utility rooms.
2. Concealed Concrete: Concrete covered by structure or with finish material other than that applied directly to its surface. Included is exposed concrete in mechanical and utility rooms.
3. Architectural Concrete: Same as “exposed concrete” except special care is taken to achieve uniform shape, surface, texture and color. Architectural concrete is not to be covered with any other finish.
Thus, the subcontract expressly defines “exposed concrete” as including “exposed-to-view” concrete, including those surfaces to receive a finish.[24] Under the subcon *644 tract, the scope of RGM’s work was defined as “exposed concrete,” and that term expressly includes “exposed-to-view” concrete which is to receive a finish. Accordingly, we disagree with RGM’s contention that section 03300 could not apply to its work because it refers to “exposed-to-view” concrete.[25]
In sum, RGM failed to establish it fully performed under the subcontract as a matter of law because it failed to present proof it performed to Campbell’s satisfaction or that his rejection of its work was unreasonable or due to fraud, misconduct, or gross mistake. Also, because we find the subcontract is ambiguous regarding the specifications applicable to RGM’s work, a fact issue exists as to the intent of the parties. We sustain T & S’s subissues one and two regarding RGM’s performance.
4. Did the Trial Court Grant RGM More Relief than it Requested?
In its second issue, T & S also claims the trial court erred by granting RGM more relief than it requested. It is well established that a summary judgment can only be granted on the grounds addressed in the motion. See Tex.R. Crv. P. 166a(c); McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 341 (Tex.1993); Roof Sys., Inc. v. Johns Manville Corp., 130 S.W.3d 430, 436 (Tex.App.-Houston [14th Dist.] 2004, no pet.). A judgment granting more relief than the movant is entitled to is subject to reversal. Lehmann v. Har-Con Corp., 39 S.W.3d 191, 200 (Tex.2001).

a. Venue

RGM initially filed suit against T & S in Travis County. However, in paragraph 10.1 of the subcontract, RGM agreed that venue for all suits involving the subcontract would be “mandatory and exclusive” in Harris County. T & S filed a motion to transfer venue, and the case was subsequently transferred to Harris County. T & S argues RGM’s “breach” of the venue provision was not addressed in RGM’s summary judgment motion.
However, we decline to hold that RGM’s breach of the venue provision was a material breach sufficient to sustain a separate cause of action. T & S does not cite, and we have not found, any authority to support its claim that a separate cause of action exists for the breach of this venue provision. Importantly, to the extent the venue provision was breached, T & S sought specific performance of that provision by filing its motion to transfer venue, and the motion was granted. Cf. Karagounis v. Bexar County Hosp. Dist., 70 S.W.3d 145, 147 (Tex.App.-San Antonio 2001, pet. denied) (citing to Nat'l Life Co. v. Rice, 140 Tex. 315, 167 S.W.2d 1021, 1024 (1943) and stating that specific performance was relief sought because it had the effect of carrying out the terms of the contract). Therefore, T & S received a remedy for any breach of the venue provision when the suit was transferred.[26] Ac *645 cordingly, the trial court did not grant RGM more relief than requested concerning T & S’s venue claim.

b. Reformation

T & S also asserts it pleaded an alternative cause of action for reformation of the subcontract based on mutual mistake that was not addressed in RGM’s summary judgment motion. In its amended answer T & S pleaded that, should the trial court determine the parties to the subcontract did not incorporate the General Conditions of the prune contract, the failure to do so was a result of the mutual mistake of the parties. T & S requested the court reform the subcontract to incorporate those provisions.
RGM concedes it did not address this claim in its summary judgment motion,[27] but instead, argues that T & S asserted mutual mistake as an affirmative defense and therefore, it was not required to address the issue. See Gulf, C. & S.F. Ry. Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492, 500 (1958).
Reformation may be an appropriate and equitable remedy in certain breach of contract actions. See Nelson v. Najm, 127 S.W.3d 170, 176-77 (Tex.App.Houston [1st Dist.] 2003, pet. denied); Howard v. INA County Mut. Ins. Co., 933 S.W.2d 212, 219 (Tex.App.-Dallas 1996, writ denied). In a claim for reformation, a party seeks to correct a mutual mistake made in preparing a written instrument so that the written contract accurately reflects the original agreement of the parties. Cherokee Water Co. v. Forderhause, 741 S.W.2d 377, 379 (Tex.1987). Therefore, reformation requires an original agreement and a mutual mistake, made after the original agreement, in reducing it to writing. Id. Mutual mistake then is a necessary element of reformation, but this does not render reformation an affirmative defense. See id.
Because RGM did not address T & S’s reformation claim in its summary judgment motion, and does not direct us to any evidence in the record which would defeat the claim as a matter of law, we conclude that the trial court’s grant of summary judgment on T & S’s claim for reformation was error. See Rush v. Barrios, 56 S.W.3d 88, 97 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (noting to defeat counterclaim, plaintiff must prove, as a matter of law, each element of its cause of action and disprove at least one element of defendant’s counterclaim); Hobbs v. Hutson, 733 S.W.2d 269, 271 (Tex.App.-Texarkana 1987, writ denied) (finding reformation counterclaim was not defeated by movant’s summary judgment counterclaim). Therefore, we sustain T & S’s subissue that the trial court granted more relief than requested.
5. Did the Trial Court Err in Granting RGM Partial Summary Judgment on T & S’s DTPA Claims and in Granting Sanctions Against T & S?
In its second issue, T & S also argues the trial court erred in granting RGM’s partial summary judgment motion on T & S’s DTPA claims and in granting sanctions under that statute.
According to T & S’s allegations, it agreed to hire RGM only if RGM hired Tony Schroen, with Access/Formwork Design, Inc., for the project. T & S asserted that without Schroen’s expertise, RGM lacked experience in the form systems used in the project. T & S claimed that *646 RGM began the project with Schroen, but withheld payments from him beginning in November 1997 and eventually fired him. T & S also claimed it was led to believe that RGM, under Schroen’s guidance, understood the requirements of the project and the standards applicable to its work, and that RGM would be able to meet those requirements. Further, T & S alleged that RGM led T & S to believe it would hire Coburn to perform the remedial work and pay for those costs, and that RGM would pui'sue its claim through Campbell. Based on these allegations, T & S asserted claims against RGM for violations of the DTPA under seven subsections of section 17.46(b). T & S also asserted that these acts were unconscionable under section 17.45(5) and 17.50(a)(3).
RGM filed a “Motion for Partial Summary Judgment on Applicability of DTPA Section 17.49(f) Exemption,” asserting that section 17.49(f) of the DTPA exempted the transaction between the parties because the total contract price was over $100,000, T & S’s lawyers “stipulated that the Subcontract was reviewed and approved,” and the project was not T & S’s residence. In response, T & S provided deposition testimony from Bart Dansby, T & S’s project manager, in which he stated he negotiated the contracts with potential subcontractors and he did not consult with an attorney during negotiations. The trial court granted RGM’s partial summary judgment motion.
Section 17.49(f) provides as follows:
Nothing in the subchapter shall apply to a claim arising out of a written contract if:
(1)the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000;
(2) in negotiating the contract the consumer is represented by legal counsel who is not directly or indirectly identified, suggested, or selected by the defendant or an agent of the defendant; and
(3) the contract does not involve the consumer’s residence.
Tex. Bus. & Com.Code Ann. § 17.49(f). On appeal, T & S argues that RGM failed to conclusively establish the second element, that T & S was represented by an attorney during negotiations of the contract.[28]
During Dansby’s deposition, RGM’s counsel questioned him about negotiating a subcontract and noted that “Exhibit No. 9 is a subcontract agreement,” but qualified his questions as not “specifically asking about RGM’s subcontract.” Subsequently, RGM’s counsel was questioning Dansby about Article 10 in the subcontract, the choice of law provision, and asked Dansby if he thought that provision was drafted by an attorney. T & S’s attorney interrupted the questioning and asked RGM’s counsel if he was trying to establish that the contract was prepared or approved by an attorney. RGM’s counsel responded in the affirmative. T & S’s attorney then stated, “We will stipulate that [T & S’s] attorneys have reviewed and, approved Exhibit 9.” In subsequent deposition testimony, not attached to the partial summary judgment motion but referred to on appeal, a witness asserted that Exhibit 9 was a copy of RGM’s subcontract. Based on this testimony, RGM contends T & S’s attorneys reviewed and approved the Subcontract entered into by the parties and further asserts that the statute does not require an attorney actively “negotiate” the contract.
Examining the deposition testimony in a light most favorable to T & S, it appears that T & S’s attorney stipulated to *647 the fact that its attorneys had reviewed and approved the subcontract form, but not necessarily that T & S’s attorneys had reviewed and approved RGM’s subcontract. It is undisputed that RGM’s subcontract had been amended — as reflected in Attachment G — -from the general subcontract form during the negotiations between the parties. Also, were we to accept RGM’s argument on this issue, the term “negotiate” as used in the statute would have little or no meaning, recognizing the fact that most form contracts are reviewed and approved by attorneys.
Regardless, even assuming the stipulation pertained specifically to RGM’s subcontract, T & S produced Dansby’s deposition testimony in which he stated that he negotiated the contracts and did not consult with an attorney. At a minimum, this testimony raises a fact issue as to whether an attorney was involved in negotiating the subcontract. We hold that the trial court erred in granting RGM’s motion for partial summary judgment on T & S’s DTPA claims on the basis that the transaction was exempted under section 17.49(f).[29] See Cuyler v. Minns, 60 S.W.3d 209, 212 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (“Summary judgments must stand on their own merits.”).
T & S’s claims that RGM failed to perform as required in the contract are causes of action for breach of contract. See Crawford v. Ace Sign, Inc., 917 S.W.2d 12, 14 (Tex.1996); Munawar v. Cadle Co., 2 S.W.3d 12, 18 (Tex.App.-Corpus Christi 1999, pet. denied). However, T & S’s DTPA claims allege conduct amounting to more than mere non-performance of the contract. See Munawar, 2 S.W.3d at 19. “The determination of whether a breach of contract rises to the level of a misrepresentation sufficient to trigger the DTPA is a fact-driven inquiry.” Id. at 18. Once those facts are known, whether they constitute a DTPA misrepresentation is a question of law. Id.
Here, T & S claims that it was induced to enter into the subcontract due to representations by RGM that it would use Schroen on the project. See Tex. Bus. & Com.Code Ann. § 17.46(b)(5) (prohibiting representations that goods or services have qualities or sponsorship which they do not have). RGM did not attack the merits of T & S’s DTPA claims. Consequently, RGM failed to establish as a matter of law that T & S could not recover under this claim or that the claim is only a breach of contract claim. Because we hold the trial court erred in granting partial summary judgment to RGM on T & S’s DTPA claims, we also conclude that the trial court erred in granting sanctions against T & S on its DTPA claims. We sustain T & S’s sub-issue on this matter.
In conclusion, regarding T & S’s second issue on appeal, we hold that the trial court erred in (1) granting RGM’s summary judgment because RGM failed to establish as a matter of law that it fully performed under the subcontract and fact issues exist as to RGM’s performance, (2) granting summary judgment in connection with T & S’s reformation claim, and (3) granting RGM’s partial summary judgment motion on T & S’s DTPA claims and granting sanctions on those claims against T & S. Accordingly, we sustain T & S’s second issue on appeal.
C. T & S’s Summary Judgment Motions
T & S also argues that the trial court erred in denying its summary judgment *648 motions because RGM failed to comply with a contractual condition precedent.[30] According to T & S, RGM was required under the subcontract to present its claim — that the requested remedial work was outside the scope of its work under the subcontract — to T & S, and under provisions in the prime contract, T & S would, in turn, submit the claim to the owner. T & S asserts that RGM’s presentment was a condition precedent to RGM’s filing the subject suit. T & S relies, in part, on the argument that the provisions at issue are standard contractual terms within the construction industry and therefore, we must construe these provisions in a manner consistent with other jurisdictions. T & S also asserts that, unlike other contracts, construction contracts contemplate change during the course of the project and change generates dispute. Therefore, according to T & S, an efficient method of handling these changes and disputes is necessarily required to convert a two-dimensional drawing into a three-dimensional building. We examine T & S’s arguments.
1. Standard of Review
We previously set forth the standard of review applicable to traditional summary judgment motions. In addition, after adequate time for discovery, a party may move for summary judgment on the basis that there is no evidence of an essential element of the nonmovant’s cause of action. Tex.R. Civ. P. 166a(i). The motion must state the elements for which there is no evidence. Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 207 (Tex.2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. Tex.R. Civ. P. 166a(i) cmt.; Southwestern Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex.2002); Russo v. Smith Int’l, Inc., 93 S.W.3d 428, 433 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). A no-evidence summary judgment is proper if the respondent fails to adduce more than a scintilla of probative evidence in support of one or more essential elements of a claim. See Tex.R. Crv. P. 166a(i).
2. Contract Terms
T & S argues that RGM agreed to fulfill the same duties and remedies to T & S that T & S owed to the owner, and specifically, the “condition precedent” provision in General Conditions, paragraph 4.3.2, which provides:
4.3.2 Decision of Architect. Claims, including those alleging an error or omission by the Architect, shall be referred initially to the Architect for action as provided in Paragraph 4.4. A decision by the Architect, as provided in subparagraph AA4- shall be required as a condition precedent to arbitration or litigation of a Claim between the Contractor and Owner as to all such matters arising prior to the date final payment is due, regardless of (1) whether such matters relate to execution and progress of the Work or (2) the extent to which the work has been completed.
(emphasis added). This standard AIA provision is generally accepted to be an alternative dispute resolution mechanism which is “valid, enforceable and favored as a matter of public policy.” See Zandri Constr. Corp. v. Wolfe, 291 A.D.2d 625, 737 N.Y.S.2d 400, 402 (2002).
*649 T & S argues that RGM agreed to be bound by paragraph 4.3.2 through the “flow down” provision in the subcontract, Paragraph 1.2(b), which provides in part:
Subcontractor binds himself to T & S for the performance of Subcontractor’s Work in the same manner as T & S is bound to Owner for such performance under T & S’s contract with Owner. T & S’s contract with owner, excluding financial data, and all other Contract Documents listed above[31] have been made available to and read by Subcontractor. In case of conflict between this Subcontract and the other Contract Documents, Subcontractor shall be bound by [this subcontract agreement].[32]
Contrarily, RGM argues that the flow down provision of the subcontract pertains only to the performance of its work and does not incorporate the dispute resolution provision of General Conditions; therefore, according to RGM, it was not an express condition precedent to its breach of contract action.
3. Analysis
In Texas, under general principles of contract law, separate agreements may be incorporated by reference into a signed contract. See Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Servs., Inc., 73 S.W.3d 545, 549 (Tex.App.-Houston [1st Dist.] 2002, orig. proceeding); Ikon Office Solutions, Inc. v. Eifert, 2 S.W.3d 688, 693 (Tex.App.-Houston [14th Dist.] 1999, no pet.). The language used to incorporate a document is not important provided the signed document plainly refers to the incorporated document. Owen v. Hendricks, 433 S.W.2d 164, 167 (Tex.1968); Trico, 73 S.W.3d at 549. However, the doctrine does not extend to documents that simply appear to relate to the same transaction. Owen, 433 S.W.2d at 167; Trico, 73 S.W.3d at 549-50 (holding that mentioning of “General Terms and Conditions of Sale” in table of contents and a heading was not sufficient reference to incorporate). When a document is incorporated into another by reference, both instruments must be read and construed together. In re C & H News Co., 133 S.W.3d 642, 645-46 (Tex.App.-Corpus Christi 2003, orig. proceeding).

a. “Flow-down” provision and incorporation by reference

A flow down provision is a closely related concept to incorporation by reference. See T. Bart Gary, Incorporation by Reference and Flow-Down Clauses, 10 CONSTRUCTION Law. 1, August 1990, at *46. Both types of provisions are common in construction contracts because, generally, those contracts are characterized by the large number of documents involved. Id. at 44.[33]
*650 In Guerini Stone Co. v. P J Carlin Constr. Co., a subcontract directed work be performed in a manner “agreeable to the drawings and specifications.” 240 U.S. 264, 265, 36 S.Ct. 300, 60 L.Ed. 636 (1916). The Supreme Court held that reference to the prime contract in a subcontract for a particular purpose, makes the prime contract a part of the subcontract only for the purpose specified. See id. at 277, 36 S.Ct. 300. Other courts have followed this precedent. See, e.g., H.W. Caldwell & Son, Inc. v. United States ex rel. John H. Moon & Sons, Inc., 407 F.2d 21, 23 (5th Cir.1969) (same, suit involved Miller Act); Washington Metro. Area Transit Auth. v. Norair Eng’g Corp., 553 F.2d 233, 235 (D.C.Cir.1977) (same, suit involved Miller Act); A.F. Lusi Constr., Inc. v. Peerless Ins. Co., 847 A.2d 254, 261 (R.I.2004) (construing “to the extent of the Work to be performed by Subcontractor” as not applying to insurance requirements under the prime contract); see also Seale v. Roy M. Mitchell Contracting Co., 321 S.W.2d 149, 150-51 (Tex.Civ.App.-Austin 1959, writ ref'd) (finding that phrase “pertaining to his part of the work” did not incorporate the arbitration provision in the prime contract).
However, other courts examining flow down provisions have found that the administrative clauses within the prime contract, such as arbitration clauses, are incorporated into the subcontract. See, e.g., Turner Constr. Co. v. Midwest Curtainwalls, Inc., 187 Ill.App.3d 417, 135 Ill. Dec. 14, 543 N.E.2d 249, 252 (1989) (finding that flow down obligations of subcontractor were not limited to the work to be performed); J.S. & H. Constr. Co. v. Richmond County Hosp. Auth., 473 F.2d 212, 214-15 (5th Cir.1973) (finding incorporation by reference and distinguishing contrary cases as those involving the Miller Act). In these latter cases, the contract provisions contained a specific reference to or incorporation of those obligations or documents flowing down to the subcontractor. See, e.g., Turner Constr., 135 Ill.Dec. 14, 543 N.E.2d at 252 (defining “Contract Documents” as including the “general conditions” of the prime contract); J.S. & H. Constr., 473 F.2d at 213-16 (finding arbitration clause applied to subcontractor because subcontract incorporated by reference the general conditions of the prime contract and contained flow down provision). Here, we find no such specific incorporation of dispute resolution provisions within the subcontract.
Paragraph 5.3.1 of the General Conditions provides the following:
5.3 SUBCONTRACTUAL RELATIONS
5.3.1 By written agreement, for validity, the Contractor shall require each Subcontractor, to the extent of the work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these Contract Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights....
(emphasis added). This provision is not self-executing. Instead, it puts the burden on the contractor to obtain a written agreement from the subcontractor in which the subcontractor assumes the same responsibilities towards the contractor that the contractor has assumed towards the owner. See MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc., *651 802 N.E.2d 901, 908-09 (Ind.2004). In MPACT Construction Group, the Indiana Supreme Court examined a dispute involving provisions mirroring those at issue here. See id. The Indiana court noted the following, which we find instructive:
A comment from the [AIA], drafters of the General Conditions, provides some guidance. It first states, “A basic requirement of the contract is that subcontractors be bound by the terms of the contract documents. AIA Document A401 Standard Form Agreement Between Contractor and Subcontractor, so provides.” But the next sentence reads, “If other subcontract forms are utilized, care must be taken to coordinate them with Subparagraph 5.3.1.” This indicates that if the general contractor uses subcontract forms other than those provided by the AIA ... it must in its own contract include a provision requiring the subcontractors to assume the same responsibilities that it assumes toward the owner.
Id. at 909. Similar’ to the contractor in MPACT, although T & S may have thought its flow down provision sufficed to bind RGM to the “condition precedent” provision, because the subcontract lacks language incorporating the General Conditions of the prime contract into the subcontract, we cannot conclude that RGM was bound to the condition precedent provision. Also, paragraph 8.1 in the subcontract states: “T & S agrees to be bound to Subcontractor by all the obligations that Owner assumes to T & S under the Contract Documents and by all provisions thereof affording remedies and redress to T & S from Owner insofar as applicable to this Subcontract.” However, there is no reciprocal provision within the subcontract, binding RGM to T & S. Thus, it is reasonable to conclude that the parties had not intended RGM would be bound to T & S in the same manner T & S was bound to RGM.
T & S also argues that the project manual, as referenced in Attachment B to the subcontract, fully incorporates the provisions of the General Conditions. Specifically, the reference to the project manual in Attachment B states, “SPECIFICATIONS/PROJECT MANUAL.” A mere reference to another document is insufficient to establish a wholesale incorporation of the referenced document. See Trico, 73 S.W.3d at 550. Further, because this reference identifies “specifications” in connection to the project manual, set off with a slash, a reasonable construction is that the project manual was incorporated only to the extent of the specifications.[34] This heading is, at best, ambiguous. See id. (noting that a “heading” within a contract may be ambiguous if it is unclear whether it is a heading or a contractual term).[35]
*652 Accordingly, because the flow down provision in the subcontract is limited to the performance of RGM’s work, we cannot conclude as a matter of law that RGM agreed to be bound to the “condition precedent” provision by virtue of the flow down provision.

b. Claims for “extra compensation”

Nevertheless, examining the entire subcontract, it is clear that RGM did have some obligation to submit claims to T & S in reference to the General Conditions. RGM expressly agreed to submit claims for extra compensation and extensions of time to T & S. Paragraph 4.4 of the subcontract, under “Changes in the Work,” provides as follows:
Subcontractor will make all claims for extra compensation and extensions of time to T & S promptly in accordance with this Article and consistent with the Contract Documents. Subcontractor agrees that the time listed in the Contract Documents within which notice must be given for a claim or any appeal is reduced by five (5) days for all notices submitted by Subcontractor. T & S agrees to pursue reasonable claims submitted by Subcontractor against Owner under the provisions of the Contract Documents.[36] Subcontractor shall be responsible for preparation of the claims and for all legal and other costs incurred by T & S.
Thus, RGM agreed to make any claims “for extra compensation” consistent with the prime contract. T & S also argues that the dispute resolution provision is incorporated by reference through this language.[37]
Even assuming RGM had agreed to submit claims in accordance with the General Conditions, by the plain language of the subcontract, RGM agreed to submit only those claims dealing with extra compensation.[38] Because we interpret words contained in a contract according to their plain and ordinary meaning, “extra compensation” implies compensation given beyond the contract price. Sun Operating, Ltd. v. Holt, 984 S.W.2d 277, 285 (Tex.App.-Amarillo 1998, pet. denied); see Rhoads Drilling Co. v. Allred, 123 Tex. 229, 70 S.W.2d 576, 582 (1934) (dealing *653 with payment for ex officio services, finding “extra compensation” means any sum given in addition to the contract price or salary). Therefore, whether RGM’s claim is one for “extra compensation” can only be determined in reference to the scope of RGM’s work as defined in the subcontract. As we have previously determined, the subcontract is ambiguous as to the scope of RGM’s work. Consequently, the question of whether RGM was required to submit this claim to T & S prior to filing suit hinges on disposition of the ambiguous language.
RGM argues that it is seeking only to be paid for the full amount of the contract and not for any payment outside the contract; therefore, RGM contends this is not a claim for extra compensation. However, we reject this distinction. Here, the subcontract clearly anticipated that the project may require adjustment or changes in the work. Indeed, the “extra compensation” clause is contained in Article 4 of the subcontract, entitled “Changes in the Work.” Also, the subcontract provides that a subcontractor is to carry on any work and maintain progress during any dispute. Paragraph 4.1 of the subcontract expressly states that T & S and RGM “agree that T & S may add to or deduct from the amount of Work covered by this subcontract....” Thus, when the subcontract is read in its entirety, “extra compensation” pertains to “changes” in the work, whether adding to or deducting from the amount of work covered by the subcontract. See Coker, 650 S.W.2d at 393 (stating contract must be construed in its entirety); see also Cook Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 131-32 (Tex.App.Houston [14th Dist.] 2000, pet. dism’d). Although RGM characterizes its claim as something other than “extra compensation,” RGM is in fact contending that T & S is wrongfully holding the contract amount due because T & S wrongfully required RGM to perform work outside the scope of the contract.
However, the subcontract expressly provides that RGM is to present claims “in accordance with” the subcontract, yet merely “consistent with ” the Contract Documents. Had the parties intended a wholesale incorporation of the “Claims and Disputes” provisions in the General Conditions, the reference to the subcontract claims provisions would be superfluous. Indeed, had the parties intended the result T & S proffers, they could have easily used the phrase: “in accordance with the Contract Documents.” Moreover, the term “consistent with” implies that RGM agreed to submit its claims only in a manner that was not contrary to the contract documents; these terms do not necessarily indicate RGM agreed to the condition precedent provision. Therefore, the reference to the prime contract is ambiguous[39] and creates a fact issue concerning the parties’ intent on this issue.[40]
In sum, the subcontract is, at best, unclear as to whether RGM agreed to submit its claims for extra compensation to T & S as a condition precedent to litigation. *654 Moreover, whether RGM’s claim is one for “extra compensation” can only be determined with reference to RGM’s scope of work as defined in the subcontract, which we previously determined was ambiguous. In light of our conclusions relative to T & S’s first issue, we remand to the trial court for further proceedings consistent with our disposition. Because we remand, our discussion of RGM’s affirmative defenses concerning the condition precedent will be relatively brief.[41]
c. RGM’s asserted “condition precedent” defenses
After RGM filed suit, T & S filed a supplement to its original answer denying that RGM had satisfied all conditions precedent and specifically asserting RGM failed to present its claim to the architect prior to any litigation.[42] RGM claims that by delaying its assertion of the condition precedent and, during that delay, litigating the issues of RGM’s performance, T & S waived the condition precedent.
Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with that right. Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex.2003); Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 189 (Tex.App.-Houston [14th Dist.] 2003, pet. granted). Generally, waiver is a question of fact. Comsys Info., 130 S.W.3d at 190. However, if facts and circumstances are admitted or clearly established, it then becomes a question of law. Id.
T & S did in fact defend the suit for some time prior to asserting the condition precedent; however, RGM does not cite to any authority in support of its claim that this delay amounts to waiver of the condition precedent. Civil Procedure Rule 54, which governs the pleading of conditions precedent, does not address when a condition precedent is timely asserted. See Tex.R. Civ. P. 54.[43] Moreover, T & S amended its answer, adding the specific denial of the condition precedent in a timely manner under Civil Procedure Rule 63, which governs the amendment of pleadings. See Tex.R. Civ. P. 63 (stating pleadings are amended timely if they do not operate as a surprise and, if within seven days of trial, with leave of the court). Therefore, we do not agree that T & S’s delay in asserting the condition precedent evidences an intentional relinquishment of the right to assert it.
We are not concluding that a condition precedent cannot be waived because of a delay in making a specific denial. We merely conclude that, under the circumstances of this case, T & S’s delay in asserting the condition precedent does not establish waiver as a matter of law. In *655 stead, we hold that whether T & S knowingly relinquished the right is a fact question.
This conclusion applies to RGM’s claim that laches bars T & S’s right to rely on the condition precedent. Lach-es is an equitable affirmative defense that requires proof of (1) an unreasonable delay by a party having legal or equitable rights in asserting those rights, and (2) a good faith change of position by another to his detriment because of the delay. Lawrence v. Lawrence, 911 S.W.2d 443, 449 (Tex.App.-Texarkana 1995, writ denied). Delay alone will not constitute laches, injury or prejudice must also be established. Id. Laches is a question of fact that should be determined by considering all of the circumstances in each particular case. See Williams v. Nevelow, 501 S.W.2d 942, 948 (Tex.Civ.App.-San Antonio 1973), rev’d on other grounds, 513 S.W.2d 535 (Tex.1974).
RGM provided evidence of attorneys’ fees incurred from November 1998 to January 2001, when T & S asserted the condition precedent. This evidence raises a fact issue as to RGM’s change of position. Whether T & S’s delay in asserting the condition was sufficient to constitute laches is also a fact question.[44]
In sum, even assuming RGM was bound to the condition precedent provision, fact issues exist as to the affirmative defenses raised by RGM regarding the condition precedent.
III. Conclusion
In conclusion, the trial court erred in granting summary judgment in RGM’s favor because RGM did not provide proof that it performed to the architect’s satisfaction and other fact issues exist concerning its performance under the subcontract. The trial court also erred in granting RGM more relief than requested on T & S’s reformation claim. Further, the trial court erred in granting RGM’s partial summary judgment on T & S’s DTPA claims and in granting sanctions against T & S on those claims. We conclude the trial court properly denied T & S’s motions for summary judgment because fact issues exist as to the intent of the parties to bind RGM to the condition precedent provision in the General Conditions, and to the other issues raised in connection with T & S’s reliance on the condition precedent. Accordingly, we reverse the trial court’s judgment and remand for further proceedings consistent with this opinion.
FROST, J., concurring and dissenting.
EDELMAN, J., concurs in result only.

. T & S had also filed third-party claims against Fidelity & Guaranty Insurance Underwriters, Inc. ("Fidelity”), the company that issued the performance bond on RGM’s work. Fidelity’s liability was resolved by the parties through an agreed stipulation, and the trial court issued a take-nothing judgment against T & S in favor of Fidelity. There are no issues presented in this appeal concerning Fidelity’s liability.

. See Tex. Bus. & Com.Code Ann. §§ 17.41-506 (Vernon 2002 & Supp.2004) (hereinafter "DTPA”).

. In a supplemental brief, T & S also requests that we affirm the trial court's judgment, and reform it to reflect prejudgment interest at a rate of 5%, in compliance with House Bill 2415. See Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, sec. 304.003(c), 2003 Tex. Gen. Laws 2096, 2096-97 (amended 2003) (current version at Tex. Fin.Code Ann. § 304.003(c) (Vernon Supp.2004)). Because we reverse and remand, we do not address T & S’s request for reformation of the judgment.

. Concrete formwork consists of pouring wet concrete into "molds" made with pieces of plywood. The concrete dries to form the particular mold.

. For edification, an offset is an indentation in the concrete surface resulting from displaced, mismatched, or misplaced forms. A fin is a protrusion in the formwork. Both are "abrupt" changes in the concrete's surface. Notably, there are abrupt and gradual irregularities occurring in concrete formwork. Abrupt irregularities are measured where they stand. Contrarily, a gradual irregularity occurs, and is measured, over a plane surface, typically over a ten foot span. Gradual irregularities result from warping and other similar uniform variations from planeness or true curvature. They are an anticipated result in formwork, arising because no structure is said to be a truly flat, plumb, or level surface. A “tolerance" is a variation from a given dimension, location, or alignment. Gradual irregularities are subject to tolerances specified in the construction documents for a project. Abrupt irregularities may also be subject to tolerances, depending upon the needs of the particular project. Regardless of its classification as abrupt or gradual, if an irregularity in the concrete surface is within a tolerance specified in the contract documents, it is not a “defect."

. The contract price was originally $317, 715. With approved change orders, the total contract price was $345,944.65. RGM claims the full amount owed under the contract is $24,165.50.

. Accordingly, section 03100 referenced in Attachment A contains the specifications corresponding to "Division 03, section 100, concrete formwork” set forth in the project manual.

. The specifications for cast-in-place concrete are found in Division 03-300; in other words, section 03300.

. The American Concrete Institute (“ACI”) publishes various specifications and guidelines for use in the construction industry.

. Remaining provisions of the Subcontract will be set forth in full when necessary to our discussion.

. RGM pleaded substantial performance as an alternative theory of recovery in its petition and also argued substantial performance in its motion for summary judgment. The substantial performance doctrine allows a party to bring a contract action to recover the full performance price, less the cost of remedying any defects that can be repaired. Smith v. Smith, 112 S.W.3d 275, 278-79 (Tex.App.-Corpus Christi 2003, pet. denied) (citing Vance v. My Apartment Steak House, Inc., 677 S.W.2d 480, 482-83 (Tex.1984)). A contractor suing on a contract for substantial performance bears the burden of proving that he substantially performed, the sum owed to him under the contract, and the cost of remedying the defects due to his errors or omissions. Weitzul Constr., Inc. v. Outdoor Environs, 849 S.W.2d 359, 363 (Tex.App.-Dallas 1993, writ denied). RGM argued in its summary judgment motion that there was a fact issue as to the appropriate cost to remedy any alleged defects, and the trial court awarded the full remaining contract price to RGM. On appeal, RGM argues only that it fully performed under the contract and does not argue any substantial performance issues. See Nabors Corp. Servs., Inc. v. Northfield Ins. Co., 132 S.W.3d 90, 100 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (concluding argument abandoned on appeal). Accordingly, we do not address the issue of whether RGM substantially performed under the subcontract. See Provident Life & Acc. Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex.2003) (noting summary judgment can only be affirmed on meritorious grounds specifically presented to the trial court and properly preserved for appellate review).

. In its response, RGM also argued that its claim in this case was not that Campbell wrongfully rejected its work, but that T & S wrongfully identified work outside the scope of RGM’s subcontract. If, as evidenced by the language of the subcontract, RGM’s work was to be performed to the satisfaction of the architect and the architect rejected RGM’s work, RGM's distinction of its argument is immaterial. This is particularly true because RGM moved for summary judgment, claiming it had fully performed under the subcontract and had the burden to prove performance as a matter of law. As support for this argument, RGM included testimony from Campbell that he was not aware of the terms of the subcontractors’ contracts; however, Campbell also testified that ‘'it was common knowledge” that RGM was doing the formwork and he specifically found that the formwork was not within the contract specifications.

. We discuss the condition precedent issue in a subsequent portion of this opinion. See Section C. infra.

. On appeal, RGM contends that T & S waived the argument that it had to perform to the satisfaction of Campbell because T & S did not address that assertion in its initial brief. We disagree. T & S's evidence of Campbell’s rejection of RGM's work was excluded by the trial court based upon RGM’s objections. In its initial brief, T & S argued that this evidence had been erroneously excluded, stating:
*641 Mr. Campbell did not offer testimony at variance with the language of the contract. He testified from personal knowledge as to the facts surrounding his actions in his capacity as project architect. That testimony went to the heart of the parties’ factual dispute and therefore, was admissible. "Contract terms are not changed when the architect decides in the course of a job what a specification means or whether one specification trumps another.” In fact, this case cannot be tried without the evidence that, rightly or wrongly, Mr. Campbell rejected RGM’s work, and no one is better qualified to offer that evidence than Mr. Campbell, himself.
(citations omitted). Although couched in an evidentiary context, T & S did argue that Campbell's rejection of the work was the pivotal issue in the case and could not be resolved without his testimony. Also, the quotation relied on by T & S in support of its statement comes from a Massachusetts case dealing with an architect's decisions concerning the quality of work. See Fontaine Bros. v. City of Springfield, 35 Mass.App.Ct. 155, 617 N.E.2d 1002, 1004 (1993).

. Because Campbell’s rejection of RGM’s work was reflected in RGM’s summary judgment evidence, we do not address T & S's subissue three on appeal regarding the trial court’s rulings on the admissibility of Campbell’s statements.

. RGM objected to T & S's inclusion of the section 03300 specifications in its summary judgment evidence, but RGM attached these specifications to its motion for summary judgment as exhibit 35.

. A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. St. Paul Ins. Co. v. Tex. Dept. of Transp., 999 S.W.2d 881, 887 n. 5 (Tex.App.-Austin 1999, pet. denied) (citing Sage Street Assocs. v. Northdale Const. Co., 863 S.W.2d 438, 445 (Tex.1993)).

. In referring to the specifications, the dissent states "the Subcontract directs RGM to 'Specifications Section 3100 of the Contract Documents.' ” However, the dissent quotes the appellee's brief and not the subcontract. The terms of the subcontract regarding the specifications are set forth above. In particular, the subcontract contains the following language pertinent to RGM’s work: "specifically includes, but is not limited to ... ” the specifications found in Division 1, entitled "General Requirements,” and Division 2, Section 03100, "Concrete Formwork.” As explained in this plurality opinion, Section 03100 is not found in Division 2, but rather in Division 3 of the project manual. Division 3, entitled "Concrete Work,” also contains section 03300, which pertains to "Cast-in-Place Concrete.” RGM's work was defined in the subcontract as providing "formwork for cast-in-place and precast concrete.” (Emphasis added).

. We respectfully disagree with the dissent's conclusion that only section 03100 applies to RGM’s work. As noted, under the express language of the contract, RGM's work included cast-in-place concrete and the project manual specifications applicable to cast-in-place concrete are in section 03300.

. Paragraph 16 of Attachment A also indicates that if the specifications are not sufficiently detailed, the better quality of work should apply, and section 03300 requires a higher level of finish than does section 03100.

. Division 2 in the specifications, entitled "Sitework,” may or may not address requirements of the entire project. The parties do not address the application of Division 2 to RGM’s work.

. Having found a fact issue as to the scope of RGM’s work, we reject RGM’s argument that T & S committed the first material breach of the subcontract by sending the March 19, 1998 letter requesting RGM to perform, what RGM characterizes as "extra work without extra compensation.”

. In some of the ACI publications in the record, there is a distinction between exposed-to-view concrete and exposed concrete. However, the definitions in section 03100 control over those publications by virtue of the language in paragraph 1.03(A.) of the subcontract.

.We note, in his deposition testimony, Campbell also stated that the areas at issue were required to have an "architectural finish concrete” because they were “exposed to view.” We do not address whether the finish was an architectural finish because the subcontract does not indicate, and T & S does not argue, that it was.

. Section 03300, 3.06(B.)(1.) provides as follows:
Provide as-cast smooth form finish for formed concrete surfaces that are to be exposed-to-view, or that are to be covered with a coating material applied directly to the concrete, or a covering material bonded to the concrete such as waterproofing, dampproofing, painting, or other similar system.
(emphasis added). In this case, the acoustical spray-on texture was to be applied directly to the undersides of the slabs. Thus, applying section 03300 to RGM's work would not be inconsistent with those definitions in section 03100.

. The election of remedies doctrine precludes T & S from attempting to sustain a cause of action for money damages for the breach of the venue provision. See Star Houston, Inc. v. Shevack, 886 S.W.2d 414, 422 (Tex.App.-Houston [1st Dist.] 1994), writ denied per curiam, 907 S.W.2d 452 (Tex.1995) ("A party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is ren *645 dered, under which remedy he wishes the court to enter judgment.”).

. RGM states in its brief that T & S’s answer adding reformation was filed after RGM had filed its summary judgment motion. RGM does not claim the pleading was untimely filed nor does the record reflect that it was.

. The parties do not dispute that T & S purchased RGM’s construction services.

. Moreover, without addressing the propriety of RGM’s incorporation of the entire record in response to T & S’s motion to reconsider the trial court's order on the partial summary judgment, we do not agree with RGM's contentions that there is absolutely no support for T & S’s DTPA claims in the entire record of the case.

. T & S filed a no-evidence summary judgment motion arguing there was no genuine issue that RGM failed to present any claim to T & S or the architect within the time period required under the subcontract. T & S filed a "Motion for Final Judgment,” asserting that its supplemental evidence established RGM judicially admitted that it did not file a claim. The trial court denied both motions.

. The “Contract Documents listed above” refers to attachments to the subcontract, A through G.

. This subcontract provision is not a standard AIA clause and the bracketed language reflects agreed upon changes to the subcontract form used, added through the language of Attachment G, "Subcontract Amendments.”

. Incorporation by reference and flow down provisions conveniently serve to incorporate a number of documents into a single contract. T. Bart Gary, Incorporation by Reference and Flow-Down Clauses, 10 Construction Law. 1, August 1990, at *46. As well as being convenient, these provisions also “represent efforts to ensure consistency of obligations throughout the various tiers of the contracting process.” Id. Therefore, as argued by T & S, we should strive to construe a flow down provision in a manner consistent with other jurisdictions because those provisions are commonly used in construction contracts across jurisdictions. See also Nat’l Union Fire Ins. Co., 907 S.W.2d at 522 (noting that courts construe insurance contracts consistent with *650 other jurisdictions because the provisions are identical across jurisdictions).

. This interpretation would be consistent with the conclusion that RGM agreed to be bound to the extent of its work to be performed.

. T & S did argue that the administrative provisions of the General Conditions were incorporated into the subcontract through reference to "Division 01," specifically set forth in Attachment A to the subcontract. According to T & S, under Division 01, tab 1015 in the project manual, entitled "Construction Documents,” there is language specifically incorporating the General Conditions. However, as noted by RGM, this specific argument has not been preserved for our review because T & S failed to raise the argument in its initial appellate brief. See Tex.R.App. P. 38.1(h), 38.3; Triad Home Renovators, Inc. v. Dickey, 15 S.W.3d 142, 146 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (finding that argument raised in reply brief was not preserved). Moreover, the provisions within the project manual supporting T & S's incorporation by reference argument here were excluded from the summary judgment record through RGM’s objections.

.The Texas Supreme Court recently concluded that "pass-through” claims, as contemplated by this language of the subcontract, are permissible under Texas law despite a lack of privity between the subcontractor and the owner. See Interstate Contracting Corp. v. City of Dallas, 135 S.W.3d 605, 607 (Tex.2004). T & S cites to this decision as support for its argument that the dispute resolution provision of the General Conditions was agreed to by RGM. In Interstate, the contractor filed suit against the City of Dallas on behalf of a subcontractor for breach of contract and other causes of action. Id. at 608. The City contested the contractor’s right to bring suit on behalf of the subcontractor, arguing there was no privity of contract between the City and the subcontractor. Id. at 610. The Texas Supreme Court noted in Interstate the importance of contractual privity in bringing a cause of action and confined its rationale to construction contracts, stating that ”[r]ather than allowing a party to sue another with whom it has no privity, pass-through claims recognize the continued liability of a contractor to its subcontractor.... This liability gives the contractor, who is in privity of a contract with an owner, standing to assert the claims of its subcontractor.” Id. at 618. However, in this case, there are no claims against the owner, and there is direct contractual privity between RGM and T & S. Therefore, we do not find Interstate controlling here.

. There are no allegations in this case that RGM’s claim was one for an extension of time, and therefore, we limit our discussion to claims for extra compensation.

. To the extent the subcontract's definition as to which claims must be submitted conflicts with the broader "claims” definition under the prime contract, the subcontract language controls.

. Also, in paragraph 1.2 of the subcontract, the "Contract Documents” are defined as the attachments to the subcontract, Attachments A through G. These attachments do not include the General Conditions. However, the term "Contract Documents” contained in paragraph 4.4 appears to reference the prime contract. Arguably then, the reference to “Contract Documents” in paragraph 4.4 is ambiguous.

. Also, conditions precedent are not favored in the law, and courts tend to construe contract provisions as covenants rather than as conditions. See Criswell v. European Crossroads Shopping Ctr., Ltd.., 792 S.W.2d 945, 948 (Tex.1990). It is also for this reason that we hesitate to conclude that RGM agreed to the condition precedent provision in the General Conditions by reference to the prime contract.

. We do not agree with RGM's conclusion that its pay request submitted after receipt of the default letter sufficed as a notice to T & S of its claim. The pay request did not comply with the subcontract claim provisions.

. In its original answer, T & S generally denied that RGM had performed all conditions precedent to its right to recovery. Although T & S argues this was a sufficient assertion of the condition precedent, under Rule of Civil Procedure 54, this denial is insufficient to require that RGM prove it complied with the condition precedent. See Tex.R. Civ. P. 54; Greathouse v. Charter Nat’l Bank-Southwest, 851 S.W.2d 173, 177 (Tex.1992); Wade & Sons, Inc. v. Am. Standard, Inc., 127 S.W.3d 814, 825-26 (Tex.App.-San Antonio 2003, pet. denied).

.Assuming the requirement under Rule 54 — that a party "prove” those conditions precedent specifically denied — is an indication of timeliness under the Rule, proof would be offered at trial or as summary judgment evidence. Here, T & S specifically denied the condition precedent more than one year before submission of the summary judgment motions.

. In addition, there is evidence in the record that RGM did advise T & S it would communicate with Campbell directly regarding his rejection of the work and T & S did argue this action by RGM amounted to estoppel. Whether RGM’s statement would bar its ability to assert the equitable defense of laches also remains a fact issue.